877 So.2d 414 (2003)
Gloria PARTLOW, Personal Representative of the Heirs of the Estate of Sonya L. Partlow, Deceased, Appellant,
v.
Rickey McDONALD, Appellee.
No. 2002-CA-01309-COA.
Court of Appeals of Mississippi.
September 23, 2003.
Rehearing Denied December 16, 2003.
Certiorari Denied July 15, 2004.
*415 Brian H. Neely, Tupelo, attorney for appellant.
Brian Douglas Mayo, and Wade G. Manor, Jackson, attorneys for appellee.
Before KING, P.J., MYERS and GRIFFIS, JJ.
GRIFFIS, J., for the Court.
¶ 1. Sonya Partlow was struck by a vehicle operated by Rickey McDonald and subsequently died. The heirs of Partlow's estate filed a wrongful death action. In a bench trial, the lower court granted McDonald's motion for directed verdict on the issue of liability. Finding no error, we affirm.

FACTS
¶ 2. On the evening of August 10, 1998, Rickey McDonald left his employment and traveled toward his home. He turned onto the entrance ramp to Highway 45 and, while he was about to merge into traffic on Highway 45, McDonald's van struck Sonya Partlow.
¶ 3. Gloria Partlow, as the personal representative of Sonya Partlow's estate, filed a wrongful death action in the Circuit Court of Lee County. The plaintiff alleged that McDonald was negligent because he failed to yield the right-of-way to a pedestrian, to keep a proper lookout, to exercise reasonable care, and to maintain control of his vehicle. The plaintiff also alleged that McDonald violated various traffic laws and that his acts were wilful, wanton and reckless. A bench trial was held on May 1, 2002.
¶ 4. Preston "Buddy" Irving, the Tupelo police officer who responded to the scene, testified that McDonald was at the scene *416 when he arrived and that his van was parked on the shoulder of the highway. Officer Irving testified that the area of impact was in McDonald's lane of traffic. Further, the officer testified that he observed some skid marks in the north and south lanes of traffic, but could not say for sure that McDonald's vehicle had made them. Officer Irving testified that there were no other witnesses to the accident and that McDonald tested negative for alcohol or drug use. He also testified that the speed limit on Highway 45 was 65 miles per hour and that no speed limit was posted on the entrance ramp. Based on his investigation, Officer Irving testified that McDonald was traveling at a speed of 55 miles per hour.
¶ 5. McDonald testified that he was going about 45 miles per hour on the entrance ramp to Highway 45. McDonald testified that his headlights were on, and he saw nothing in front of him on the entrance ramp. When he got to the top of the ramp, McDonald testified that he turned his head to the left to view the oncoming traffic in preparation to merge. When he turned his head back around, McDonald said he saw "the image of a hand. And as soon as I seen it, it hit my windshield." McDonald further testified that after his van made contact with the decedent's body, his finger got caught in the steering wheel and he lost control of his van. McDonald's van crossed the median into the other lane of traffic before he regained control.
¶ 6. After McDonald presented his case, Partlow made a motion for a directed verdict on liability. McDonald countered with his own motion for directed verdict asserting that Partlow had failed to make a prima facie case for negligence. The judge granted McDonald's motion for directed verdict. Aggrieved, Partlow has appealed to this Court. Partlow assigns several errors to the lower court; however, we find the only issue dispositive of this appeal is whether or not it was proper for the trial court to grant McDonald's motion for directed verdict.

STANDARD OF REVIEW
¶ 7. In a non-jury trial, such as this case, the appropriate motion is not a motion for directed verdict pursuant to Mississippi Rule of Civil Procedure 50;[1] instead, the correct motion is a motion for involuntary dismissal pursuant to Mississippi Rule of Civil Procedure 41(b). Buelow v. Glidewell, 757 So.2d 216, 220(¶ 12) (Miss.2000). In Mississippi Real Estate Commission v. Geico Financial Services, Inc., 602 So.2d 1155, 1156 n. 1 (Miss.1992), the Mississippi Supreme Court reasoned:
Technically and procedurally, the court granted a dismissal on the merits pursuant to Miss.R.Civ.P. 41(b) since this was a non-jury trial. A directed verdict under Miss.R.Civ.P. 50 is limited in use to "cases tried to a jury with a power to return a binding verdict." Comment, Miss.R.Civ.P. 50; Mitchell v. Rawls, 493 So.2d 361, 362 (Miss.1986).
Therefore, we will consider this appeal based on the correct standard of review, which under Rule 41(b) is different than the standard of review applicable to a motion for a directed verdict under Rule 50. Century 21 Deep South Properties, Ltd. v. Corson, 612 So.2d 359, 369 (Miss.1992); Mitchell v. Rawls, 493 So.2d 361, 362-63 (Miss.1986); Davis v. Clement, 468 So.2d 58, 61-62 (Miss.1985). In considering a motion for involuntary dismissal under Rule 41(b), the trial court should consider *417 "the evidence fairly, as distinguished from in the light most favorable to the plaintiff," and the judge should dismiss the case if it would find for the defendant. Corson, 612 So.2d at 369 (emphasis added). On appeal, we must apply the substantial evidence/manifest error standard to an appeal of a grant or denial of a motion to dismiss pursuant to Mississippi Rule of Civil Procedure 41(b). Id.

I. Whether the trial court erred in granting McDonald's motion to dismiss under Rule 41(b).
¶ 8. Partlow argues that the trial court erred in granting McDonald's motion based on Smith v. Walton, 271 So.2d 409, 409 (Miss.1973). In Smith, a man was struck and killed by an automobile as he was walking on the right shoulder of the highway with his back to traffic. Id. A judgment was rendered for the defendant and the plaintiff appealed. Id. The Mississippi Supreme Court reversed and remanded for a new trial because of an erroneous jury instruction. Id. In reaching this conclusion, the court analyzed the law regarding the duties and rights of drivers and pedestrians along Mississippi's highways. The court noted the following:
In the absence of a statute to the contrary, a pedestrian has the right to use and travel upon any portion of a public highway at any time of the day or night, and his rights and the rights of one operating a vehicle thereupon are mutual, reciprocal, and equal. The operator of a motor vehicle owes to pedestrians walking along the highway the duty to exercise reasonable or ordinary care to avoid injuring them.
Id. at 413 (quoting Layton v. Cook, 248 Miss. 690, 696, 160 So.2d 685, 687 (1964)). The court in Smith also cited Mississippi Code Annotated section 63-3-1112 (Rev.1996) which provides:
Notwithstanding the provisions of this section every driver of a vehicle shall exercise due care to avoid colliding with any pedestrian upon any roadway and shall give warning by sounding the horn when necessary and shall exercise proper precaution upon observing any child or any confused or incapacitated person upon a roadway.
¶ 9. Partlow argues that McDonald failed to pass a three-prong test cited in Smith regarding the liability of a driver towards a pedestrian along the highway. The three parts of this test include: (1) the driver must have kept a reasonable lookout; (2) the driver must have been traveling at a reasonable and proper rate of speed under the prevailing weather conditions; and (3) he must have given warning of his approach if found to be reasonably necessary. Smith, 271 So.2d at 413-16.
¶ 10. Under the first prong of Smith, Partlow argues that McDonald failed to keep a proper lookout because Sonya Partlow was walking on the side of the road, and McDonald had a duty to be on the lookout for pedestrians on the shoulder. She also claims that McDonald breached his duty to keep a proper lookout because he turned to see if there was oncoming traffic. Partlow points to the fact that after impact the decedent's body was lying on the shoulder of the road. This is the only evidence presented by Partlow to support her claim that the decedent was walking on the shoulder of the highway.
¶ 11. After reviewing the record, we find the evidence presented does not support Partlow's contention. Officer Irving, a Tupelo police officer and accident reconstructionist, testified that the point of impact was in McDonald's lane of traffic. He also testified that the decedent's body was thrown one hundred five feet after impact. Partlow offered no evidence to dispute this testimony. In reviewing the entirety of the *418 record and the evidence presented, the only conclusion that can be drawn is that the decedent was in McDonald's lane of traffic when she was struck. Nothing in the record supports Partlow's contention that the decedent was walking on the shoulder of the highway.
¶ 12. Partlow also relies on McDonald's own testimony to support her claim that he failed to keep a proper lookout. McDonald testified that when he got to the top of the entrance ramp, he "turned back to the left and turned back, [to the front]." He testified that "it wasn't three or four seconds I had my head back to the left. I turned around and that's when I seen a hand." The plaintiff claims this admission by McDonald proves he breached his duty to keep a proper lookout.
¶ 13. We disagree. The duty to keep a proper lookout also includes looking out for other cars on the road. See Dennis v. Bolden, 606 So.2d 111, 113-14 (Miss.1992); Jobron v. Whatley, 250 Miss. 792, 798, 168 So.2d 279, 280 (1964). When a driver is merging into oncoming traffic, it is necessary to turn and look for other cars already on the highway before merging. See Miss.Code Ann. § 63-3-805 (Rev.1996). The trial court properly found that McDonald was acting as a reasonably prudent driver, and we see no error in its decision.
¶ 14. For the second prong of Smith, Partlow contends that McDonald's speed on the acceleration ramp could not have been reasonable because there was no posted speed limit. McDonald testified he was traveling about 45 miles per hour. Officer Irving testified that he estimated McDonald's speed to be approximately 55 miles per hour. The posted speed limit on Highway 45 is 65 miles per hour. The purpose of the entrance ramp is to allow a car to accelerate to the appropriate speed to merge with oncoming traffic. The lower court was correct in determining that McDonald's speed was reasonable and that he breached no duty to the decedent.
¶ 15. As to the final prong of Smith, the duty to give a warning of approach if necessary, Partlow fails to describe how this element was violated. Therefore, we cannot say the trial court erred in determining McDonald breached no duty to the decedent. Furthermore, sufficient evidence existed to support the lower court's ruling.
¶ 16. The relevant facts of this case present several duties by both the pedestrian and the driver. Mississippi Code Annotated section 63-3-1105 (Rev.1996) provides: "Every pedestrian crossing a roadway at any point other than within a marked crosswalk or within an unmarked crosswalk at an intersection shall yield the right-of-way to all vehicles upon the roadway." This statute, considered concurrently with the supreme court's ruling in Smith, establishes that while the driver of a vehicle has a duty to exercise ordinary care on highways and watch for pedestrians walking along the side, pedestrians also have a duty to yield the right-of-way to oncoming traffic if they wish to cross a highway.
¶ 17. In Hornburger v. Baird, 508 F.Supp. 84 (N.D.Miss.1980), the federal district court agreed with this conclusion. In Hornburger, the decedent was walking in the middle of a road in Inverness, Mississippi. Id. at 85. A truck driven by the defendant approached the decedent from the rear and a collision occurred. Id. The court found that the defendant negligently operated his truck at a greater rate of speed than was proper. Id. at 86. However, relying on Mississippi Code Annotated section 63-3-1105, the court found the decedent negligent as well and determined:

*419 The decedent was at or near the center of the road when he either fell into or was struck by the left front fender of defendant's truck. The collision occurred at a point in the roadway where there was not a marked crosswalk or an intersection. Under such circumstances, decedent owed a duty to yield the right-of-way to defendant's truck. Decedent failed to perform this duty and was negligent in that regard. This negligence proximately contributed to his injuries and death.
Id. at 86-87. The court found the negligence of the defendant and decedent combined to bring about the injury and death of the decedent and found they were guilty of negligence in equal degrees. Id.
¶ 18. Applying this legal analysis to the case at bar, we find McDonald breached no duty to the decedent. He was traveling at a proper rate of speed, and ascertained that the road was clear before he began to merge onto Highway 45. He then looked for oncoming traffic and in that instance the decedent crossed the road striking McDonald's vehicle. The judge in the lower court stated, "[T]he defendant in this case did not in fact breach his duty. He acted within what this court considers to be a reasonable fashion under the circumstances." We find substantial evidence existed to support the lower court's conclusion that McDonald acted as a reasonable, prudent driver under the circumstances. The judgment of the lower court dismissing the action against McDonald is affirmed.
¶ 19. THE JUDGMENT OF THE LEE COUNTY CIRCUIT COURT IS AFFIRMED. COSTS ARE ASSESSED TO THE APPELLANT.
McMILLIN, C.J., AND SOUTHWICK, P.J., BRIDGES, THOMAS, LEE, MYERS AND CHANDLER, JJ., CONCUR. IRVING, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KING, P.J.
IRVING, J., DISSENTING:
¶ 20. The majority finds that the trial court did not err in dismissing Partlow's lawsuit under Rule 41(b) of the Mississippi Rules of Civil Procedure. I note that the trial court actually granted a directed verdict. However, I agree with the majority that since this case was tried to the judge and not a jury, procedurally, the motion at the close of Partlow's case should have been a motion to dismiss. My point of disagreement with the majority, however, stems from its finding that the trial court did not err in dismissing Partlow's case at the conclusion of the presentation of her evidence.
¶ 21. McDonald offered no defense. At the conclusion of Partlow's case, Partlow moved for a directed verdict on the issue of liability, and McDonald counter-moved for a directed verdict.[2] The trial court granted McDonald's motion. In sustaining McDonald's motion, the trial court stated: "In this case, the Court having heard all of the evidence in this case, is of the opinion that the Defendant [McDonald] in this case did not in fact breach his duty. He acted within what this Court considers to be a reasonable fashion under the circumstances."
¶ 22. The trial court, in considering a motion for an involuntary dismissal under Rule 41(b), is required to "consider the evidence fairly and to give it such weight and credibility as the trial judge finds is appropriate." Buelow v. Glidewell, 757 So.2d 216, 220(¶ 12) (Miss.2000). Appellate *420 courts apply the substantial evidence/manifest error standard of review of the trial judge's decision. Stewart v. Merchants Nat'l. Bank, 700 So.2d 255, 259 (Miss.1997). Therefore, the question here is whether there is substantial evidence to support the trial judge's finding that McDonald did not breach a duty owed to Partlow's decedent. Because I believe there is a lack of substantial evidence to support that finding, I am compelled to the conclusion that the trial judge did not consider the evidence fairly. Consequently, I respectfully dissent.
¶ 23. The evidence in this case included the deposition and trial testimony of the only known eyewitness to the accident, the Appellee Rickey McDonald. I believe that a fair consideration of the totality of his testimony points to one inescapable conclusion, that he failed to keep a proper lookout as he entered the entrance ramp and proceeded toward Highway 45. A review of his deposition and trial testimony reveals a stark contradiction that can only be explained as a conscious effort by him to alter the facts to allow him to escape responsibility for the accident. I review that testimony.
Deposition testimony
A. And I proceeded to go on up the ramp. As I got nearly to the top of the ramp, I thought, well, I've seen other cars coming northbound with no headlights on.
Q. Okay.
A. So I said, look, make sure that you seen a vehicle. So I turned around and glanced and when I turned back around, I seen an image of a hand.

Q. Okay. Now, let's stop right there. Now, you were going up the ramp. You had seen some cars coming from the south going north that 
A. One car.
Q.  did not have headlights?
A. Well, I didn't know if it had headlights or not.

* * * *
Q. Now, as you were coming up the ramp and watching as you merged in, when did you turn your head back forward again?
A. I turned my head back as I seen a image of a hand.

Q. Where was the hand?

A. Up in the air.

Q. Okay. Was it on your windshield or off to the side or?

A. No, it was close to the windshield whenever I seen it.

Q. Okay.
A. Real close.
Q. Okay. What happened then?
A. I automatically steered my wheel left and hit my brake.

Q. To try to avoid a collision?
A. Right.
Q. That would have taken you more on to the highway?
A. Right.
Q. Did you stay on the highway or did you go all the way across?

A. Whenever I felt  whenever I steered my way over left, I felt  I felt my van, it started leaning.

Q. Okay.
A. So I knowed [sic] if I didn't counter react, I was going to turn my van over.
Q. Going to flip?
A. Right.
Q. I understand.
A. And after I got back right, my finger got tangled up in the steering wheel.

*421 Q. All right.
A. And I went across the median.

Q. So you lost control of the vehicle.
A. Right.
Q. I understand. And it careened across the median?

A. Right.

Q. Were you able to regain control of it?
A. Yeah.
Q. Okay. Before you struck the median barrier?
A. Right.
Q. I understand. Then what happened?
A. I stopped it on the southbound lane.

Q. Okay. I understand again. So you had gone over?
A. Right.
Q. You went all the way over?

A. Right.

Q. I understand, okay. And was your vehicle facing southbound or northbound?
A. Northbound.
Q. Okay, I understand. And now, did you feel any type of impact?
A. Yeah.
Q. You did feel an impact?
A. Right.
Q. From what?
A. From Sonya.
Q. I understand. Was it a heavy impact or light impact?
A. No, it was very heavy.
Q. Okay. Did you hear anything?
A. No.
* * * *
Q. By the time of the collision, about how fast were you going?
A. 55.
Q. Was that at the very top of the ramp?

A. Right.

Q. I understand.
A. Right.
Q. Okay. Now, after the impact and you lost control of the vehicle and got back control of it, what did you do then?
A. I automatically stopped.
* * * *
Q. All right. Now, one thing I just want to make clear. Now, right  did you see the hand upon impact or just right before impact?
A. Right before.
Q. And is that what caused you to jerk?
A. Right.
Q. Okay. And then you felt the impact?
A. Absolutely.
* * * *
Q. Okay. Let me ask you this. Now, you know, like I said, I'm not trying to trick you or anything like that. Are you contending that Ms. Partlow jumped out in front of you or anything like that?

A. No.
Q. Are you contending that she was in the road when you hit her?

A. Yes, sir, she was.

Q. How far in the road?

A. About two and a half feet.

Q. About two and a half feet over the white line, the outside line?
A. Well, she was in the right lane, northbound, right lane about two and a half feet.

*422 * * * *
Q. I understand, sir. I understand. But the entire accident happened on the ramp?
A. On  well, not on the ramp.
Q. Right at the end?
A. Right at the tip.
Q. Right. Okay. I mean 
A. Right on Martin Luther King Boulevard.
Q. Right. Right when you're about to get onto the highway?
A. Right.

Trial testimony
Q. Okay. I want to direct your attention to August 10th, 1998. I'm sure you remember that date, don't you?
A. Yes, sir, I do.
* * * *
Q. All right. And what was you driving?
A. An '87  1987 Ford van.
Q. Did you have your lights on?
A. Yes, sir.
Q. Could you see in front of you?

A. Yes, sir.

Q. All right. Did you see anybody in front of you?
A. No, I did not.
Q. Okay. Was there anything on the ramp that obstructed your view?

A. No, there was not.

Q. Okay. Were there any cars in front of you?

A. No, there was not.

Q. Clear ramp, right?
A. Clear ramp.

Q. All right. Now when you went up the ramp, what did you do?
A. Got up to the top of the ramp and turned my head to the left, and when I turned back around, I seen the image of a hand. And as soon as I seen it, it hit my windshield.

Q. I understand that. The body of Ms. Sonya Partlow hit your windshield?
A. Right.
Q. And where was that contact made, do you remember? Was it at the top of the ramp or was it on the highway? Where was it?

A. It was on the highway, 45 Highway.

Q. Which side of your truck did you see the hand on? Did you see it on your right hand or  right hand left-hand side?
A. Right hand side.
Q. So it's the side where the  off away from traffic, right?
A. Yes.
Q. All right. It would have been where the  it would have been where the service part of the road would be, right?
A. No, it was not.
Q. Where was it?
A. It was in the right lane. It was in the highway.
Q. All right. Let me ask you this, Mr. McDonald. When you had this accident, you only saw a brief glimpse?
A. Right.
Q. You didn't see  you never saw her body other than after you hit her, right?
A. Absolutely.
Q. And that was when her hand hit your windshield and her body rolled over your car, right?
A. Right.
Q. That's the first time you ever saw this woman, right?
A. That's a fact.
¶ 24. Officer Preston Irving of the Tupelo Police Department investigated the *423 accident.[3] He was not qualified as an expert nor did he testify as an expert. He testified that when he arrived on the scene, he found the victim "lying on the shoulder of the highway just north of the on ramp where it intersects Highway 45 off East Main Street." However, his testimony regarding the point of impact and how he determined the point of impact is far from clear. He first testified as follows:
Q. Did you take any measurements when you were on the scene?
A. Yes, sir, I did.
Q. Did you find any of her personal items when you were on the scene?
A. Yes, sir.
Q. What type of measurements did you take?
A. I measured  there was some  first of all there were some skidmarks visible from the area of impact over to the median. I measured those, also the tire marks what are known as furrow marks going across the grass median. And there's also some short skidmarks over in the southbound lane.
Q. Okay. Did you observe skidmarks going all the way across the four lane median into the other lane of traffic.
A. Yes, sir, I did.
Q. Did you find any of Ms. Partlow's personal items on the scene?
A. Yes, sir, I did.
Q. Where were they located?
A. Personal items were lying where the on-ramp intersects Highway 45 in the acceleration lane, not the primary inside and outside lane of traffic, but I'm referring to what's known as the acceleration lane. They were lying in the acceleration lane just north of where the ramp intersects the highway.

Q. Okay, And did you determine where the point of impact was?

A. Yes, sir. The area  what we call the area of impact, I measured exactly on the northbound point of where the on-ramp intersects the highway up to where her purse was found was 180 feet.

Q. Okay. How far was Ms. Partlow's body from the point of impact?
A. Right from the area of impact up to where her body was about 104 feet.

Q. And the items that you found, what distance were they from the area of impact as you recall them?

A. Well, they were in the area of impact.

¶ 25. On cross-examination, Officer Irving testified as follows:
Q. Okay. Now I noticed you kept referring to the areas of impact. Can you tell us the exact point of impact?

A. No, sir, I cannot.

Q. Okay. And the items or articles that you found are the purse, sunglasses, the hair piece, a sock and a shoe. These were in the area of impact, though, in the lane of traffic?

A. Yes, sir, it was.

Also, on cross-examination, Officer Irving testified that when he came on the scene, McDonald's vehicle was parked on the shoulder of the highway, approximately fifty feet north of where the victim was lying. On re-cross, Officer Irving testified that the area of impact was very close to the area where the ramp intersects with Highway 45.
¶ 26. Misty Jane Harmon, a passing motorist, arrived at the scene shortly after *424 the accident occurred. When she arrived she saw the victim "laying on  just off the side of the road face down." She and a nurse rolled the victim over to get her face up. They then administered CPR to the victim. It was her opinion that the victim's body was lying approximately two feet "off the side of the road."
¶ 27. When the testimony of the witnesses, along with the physical evidence, is carefully scrutinized and fairly evaluated, a rather convincing case of circumstantial evidence emerges that McDonald's inattentiveness caused this accident and his story of how it occurred does not add up. In fact, the evidence shows a clear conflict between Officer Irving and McDonald as to where the collision or point of impact occurred.
¶ 28. I first note that, according to McDonald's version of what happened, he undoubtedly moved his vehicle a great distance after the accident occurred. I make this deduction from his ever-changing testimony and the testimony of Officer Irving. In his deposition testimony, McDonald testified that the collision occurred at the very top of the on-ramp, not the acceleration lane, which intersects with the northbound lanes of Highway 45. He also testified that the victim was approximately two and one half feet inside the northbound lane, not the acceleration lane. He further testified that, in an effort to avoid the collision, he traveled all the way across the two northbound lanes of Highway 45, across the median, and stopped, heading north, in the southbound lane. This meant he had to travel in an easterly or northeasterly direction away from the area where the victim's body was found. However, when Officer Irving arrived on the scene, he found McDonald's vehicle parked on the shoulder of the highway approximately fifty feet north of the victim's body. According to Officer Irving, the victim's body was found on the east shoulder of the acceleration lane approximately 284 feet north of where the on-ramp intersects Highway 45. Accordingly, if the point of impact was where McDonald placed it, he traveled more than 330 feet after striking the victim. This distance is calculated by adding the distances measured and estimated by Office Irving.
¶ 29. As previously noted, Officer Irving testified that he could not pinpoint the point of impact. However, he considered the point of impact to be where the victim's personal items were found which was 180 feet from where the on-ramp intersects Highway 45. The victim's body was found 104 feet north of where the personal items were found, indicating that the victim was knocked that distance.
¶ 30. McDonald's testimony was that he never saw the victim before the impact. He only saw a hand in his windshield. This testimony is incredulous and preposterous. First, if the hand was in his windshield, it had to be attached to the victim's body. The hand could not have been in the windshield without the victim being there. Further, the hand could not have been in the windshield without the victim being in front of the vehicle unless the victim was standing to the side of McDonald's vehicle with an outstretched arm.
¶ 31. What is more logical is that McDonald struck the victim not at the point where the ramp intersects the highway but 180 feet down the acceleration lane. But, even if one takes McDonald's version to be correct, it is still obvious that he was negligent, even if the victim also may have been negligent. His testimony was that nothing obstructed his view, no other cars were on the ramp, and his lights were on. Under this fact scenario, it cannot be said that one is not negligent if he is keeping a proper lookout and fails to see a pedestrian who is two and one half feet inside his lane of travel. And if the accident occurred *425 in the acceleration lane, the same holds true regarding McDonald's negligence because again, one cannot be keeping a proper lookout in an unobstructed lane of travel and not ever see a pedestrian before striking him if the pedestrian was standing some 180 feet north of the beginning of the acceleration lane and two and one half feet inside the lane in which the motorist is merging.
¶ 32. It is no defense of the judge's decision here to say that there were no eyewitnesses to this tragic accident other than McDonald. It does not follow that his version must be accepted as true when it is contradicted by the physical facts. In criminal cases, we do not automatically accept a defendant's version of an incident even when he is the sole witness to it. If the physical facts contradict the defendant's version of what happened, the defendant is still held accountable. See, e.g., Roberson v. State, 838 So.2d 298 (¶¶ 28-29) (Miss.Ct.App.2003). I see not reason why the rule ought to be different in civil cases of this nature. Moreover, there is some significance to the fact that McDonald apparently moved his vehicle a good distance after the accident since he initially stopped his vehicle in the southbound lane of traffic. The question must then be asked why did he just not move his vehicle out of the southbound lane of traffic and leave it in the median if he was not attempting to hide something.
¶ 33. For the reasons presented, I believe that the trial judge failed to fairly consider the evidence in this case. Therefore, I would find that the involuntary dismissal of Partlow's case was error.
KING, P.J., JOINS THIS SEPARATE WRITTEN OPINION.
NOTES
[1] The comment to Mississippi Rule of Civil Procedure 50 states that "Rule 50 applies only in cases tried to a jury with a power to return a binding verdict. It does not apply to cases tried without a jury nor to those tried to the court with an advisory jury."
[2] Both Partlow and McDonald referred to their respective motions as a motion for a directed verdict even though, as previously stated, this case was tried to a judge.
[3] Officer Preston Irving is not related to the author of this separate writing.