969 So.2d 99 (2007)
William T. LARUE, as the Representative of the Estate of Ike P. Larue, Jr., Deceased, Appellant/Cross-Appellee,
v.
Maritta C. LARUE (Cutrer), Appellee/Cross-Appellant.
No. 2004-CA-02453-COA.
Court of Appeals of Mississippi.
May 15, 2007.
Rehearing Denied September 4, 2007.
*102 Betsy E. Walker, Biloxi, attorney for appellant.
Joseph R. Meadows, Gulfport, attorney for appellee.
Before KING, C.J., CHANDLER and ISHEE, JJ.
CHANDLER, J., for the Court.
¶ 1. The Chancery Court of Jackson County granted Ike P. LaRue, Jr. and Maritta C. LaRue a divorce on the ground of irreconcilable differences. Ike appeals, contesting the chancellor's property division and award of alimony and attorney's fees to Maritta. Maritta cross-appeals requesting that this Court award her attorney's fees on appeal.

FACTS
¶ 2. The parties were married in Biloxi, Mississippi on November 14, 1983, and lived in Ocean Springs. No children were born of the marriage, but both parties had adult children from earlier marriages. The parties separated when Ike moved out of the marital home in late December 2002. On January 22, 2003, Maritta filed for a divorce on the ground of cruel and inhuman treatment. After extensive discovery, the trial occurred on June 22-25, 2004. At that time, Ike was eighty-four years of age and Maritta was seventy years of age. After one day of trial, Ike and Maritta agreed to an irreconcilable differences divorce and the trial proceeded concerning the property division.
¶ 3. It was established that, during the marriage, the parties' primary income was periodic income from mineral interests which Ike had received before the marriage from his mother's estate. Ike conveyed some of these mineral interests to Maritta during the marriage. Testimony established that the parties had three bank accounts consisting of accounts in each spouse's name and one joint account. The parties' practice was to place mineral interest income into whichever account needed money. Maritta testified that she had managed the household finances since 1995. Ike testified that, while he occasionally made deposits into the accounts, only Maritta made withdrawals.
¶ 4. Ike testified that he had engaged in real estate deals with his brother during the marriage but otherwise did not work. Ike's education includes some law school. Maritta testified that she finished about two years of junior college. The year prior to the marriage Maritta worked for the Ocean Springs water department and before that she worked for ten years as a city court clerk. Maritta said that she quit working at Ike's request when they were married. Maritta testified that she did not work during the marriage and is currently unable to work due to poor health and diminished work skills. She stated that her health conditions include high blood pressure, osteoporosis, epilepsy, vascular disease, and a prolapsed bladder. She takes medication for these conditions. She also testified that she has stents in both legs.
¶ 5. Ike's daughter, Martha Fulcher, testified that, when Ike left the marital home in December 2002, he moved in with her in Jackson for six months. However, Ike needed more health care than she could provide, and Martha arranged for him to move into Sunnybrook Estates Retirement Community in Jackson. Ike's grandson, Dr. Todd Fulcher, testified that he is Ike's primary care physician. Ike and Dr. Fulcher testified that Ike has Parkinson's disease, *103 dementia, a history of coronary artery disease and bypass surgery, macular degeneration, hearing impairment, occasional vertigo, and an unsteady gait. Ike takes daily medication for these conditions. The court determined that Ike was competent to testify and, later, Dr. Fulcher opined that Ike was competent to testify on his own behalf.
¶ 6. According to Ike's first financial declaration, he receives $6,178.54 per month in royalties from the mineral interests titled in his name. Ike also receives $629 per month in Social Security for a total monthly income of $6,806.54. Ike had two bank accounts in his name at the time of trial, one at Hancock Bank with an approximate value of $1,100 and one at Trustmark Bank with a balance of $2,740. His declaration showed his combined total expenses to be $6,114.90 per month, including $2,545 per month for Sunnybrook. Maritta's financial declaration showed her that her monthly income consisted of $378 per month in Social Security and $1,800 per month in royalties from her mineral interests for a total monthly income of $2,178. Her declaration showed combined expenses of between $3,069.20 and 3,211.76. The parties' respective mineral interest income fluctuated based upon oil prices.
¶ 7. On July 20, 2004, the court entered a judgment divorcing the parties and addressing the property division, alimony, and attorney's fees. The court found that the mineral interests which Ike had conveyed to Maritta during the marriage were Maritta's separate property. The court found that Ike's half-interest in a $3,200 lot in Jackson was his separate property, as were the mineral interests titled in his name and his two bank accounts. The chancellor recognized that the commingled income from Ike's mineral interests and Maritta's mineral interests would be considered marital property. In the equitable distribution, the chancellor awarded the marital residence on Brown Road, valued at $123,890 and titled in Maritta's name, to Maritta. The chancellor awarded the 1994 Honda Accord vehicle to Maritta, with a credit for one-half the value of the vehicle against the balance of unpaid taxes and house insurance which Ike was previously ordered by the court to pay but had never paid. The court ordered Ike to pay the marital debt. Then, the court awarded permanent periodic alimony to Maritta in the amount of $700 per month. The court also awarded Maritta attorney's fees in the amount of $10,000. Finally, the court restored Maritta's former name of Cutrer.
¶ 8. Ike filed a motion to reconsider the judgment. On November 2, 2004, the court entered an amended judgment modifying in part the earlier judgment. The court reconsidered Ike's contributions to the marital home and, applying the Ferguson factors, awarded Ike a fifty percent equitable interest in the house with Maritta to have exclusive use and possession of the house for her lifetime. The court also modified its ruling that the mineral interests which Ike had conveyed to Maritta were Maritta's separate property by finding that, due to commingling, certain mineral interests were marital property subject to equitable distribution. The court found that the mineral interests conveyed to Maritta should remain Maritta's sole property. And, the court reduced Maritta's attorney's fees award to $7,000.
¶ 9. Ike appeals, assailing various aspects of the property division and the awards of alimony and attorney's fees. Maritta requests attorney's fees to cover her costs incurred in defending this appeal.

STANDARD OF REVIEW
¶ 10. This Court adheres to a limited standard of review in domestic relations *104 matters. Pearson v. Pearson, 761 So.2d 157, 162(¶ 14) (Miss.2000). We may disturb the chancery court's decision only if the chancellor's findings were unsupported by substantial evidence and were manifestly wrong or clearly erroneous, or if the chancellor applied an incorrect legal standard. Id.
I. THE CHANCELLOR ERRED WHEN HE DECLARED THE UNDIVIDED 1/3 OF IKE LARUE'S MINERAL INTERESTS CONVEYED TO MARITTA LARUE BY HER HUSBAND DURING THE MARRIAGE AS NON-MARITAL PROPERTY AND HER SOLE PROPERTY.
II. THE CHANCELLOR ERRED WHEN HE DID NOT EQUITABLY DISTRIBUTE THE UNDIVIDED 1/3 OF IKE LARUE'S MINERAL INTEREST CONVEYED TO MARITTA LARUE BY HER HUSBAND, IKE LARUE, DURING THE MARRIAGE, AS MARITAL PROPERTY.
¶ 11. In divorce cases, property division is governed by the law articulated in Hemsley v. Hemsley, 639 So.2d 909 (Miss.1994) and Ferguson v. Ferguson, 639 So.2d 921 (Miss.1994). "Fairness is the prevailing guideline in marital division." Ferguson, 639 So.2d at 929. The chancellor's first step is to classify each asset as marital or non-marital. Id. Next, the chancellor must determine the fair market value of the assets and equitably divide the marital property according to the factors listed in Ferguson. Id. at 928-29. Those factors are: (1) substantial contribution to the accumulation of the property, under which the chancellor should consider (a) the parties' direct or indirect economic contribution to the acquisition of the property, (b) the parties' contribution to the stability and harmony of the marital and family relationships as measured by quality, quantity of time spent on family duties, and duration of the marriage, and (c) the contribution to the education, training or other accomplishments by the other spouse bearing on the earning power of the spouse accumulating the assets; (2) the degree to which each spouse has expended, withdrawn or otherwise disposed of marital assets and any prior distribution of such assets by agreement, decree or otherwise; (3) the market value and the emotional value of the assets subject to distribution; (4) absent equitable factors to the contrary, the value of assets not ordinarily subject to such distribution, such as property brought to the marriage by the parties and property acquired by inheritance or inter vivos gift by or to an individual spouse; (5) tax and other economic consequences, and contractual or legal consequences to third parties, of the proposed distribution; (6) the extent to which property division may, with equity to both parties, be utilized to eliminate periodic payments and other potential sources of future friction between the parties; (7) the needs of the parties for financial security with due regard to the combination of assets, income and earning capacity, and (8) any other factor which in equity should be considered. Ferguson, 639 So.2d at 928. If a deficiency remains for one party after equitable division, then the chancellor should consider an award of alimony. Id.
¶ 12. Pursuant to Hemsley, any property acquired or accumulated during the marriage is presumptively marital property subject to equitable division. Hemsley, 639 So.2d at 914. Classifying property acquired or accumulated during the marriage as separate property requires proof that the property is "attributable to one of the parties' separate estates prior to the marriage or outside the marriage." Id. Ike argues that ambiguity lies in the chancellor's initial classification of *105 the mineral interests titled to Maritta in that it cannot be discerned whether the chancellor classified Maritta's mineral interests as marital or separate. Ike avers that, if the chancellor held that Maritta's mineral interests were part of Maritta's separate estate, the chancellor erred because the mineral interests were marital. Alternatively, Ike argues that if the chancellor found that Maritta's mineral interests were marital, then the chancellor erred by awarding her one hundred percent of those mineral interests in the equitable distribution.
¶ 13. We review the evidence pertaining to Maritta's mineral interests and the chancellor's holdings in the judgment and amended judgment. Deeds reflecting the mineral interests were admitted into evidence. On February 12, 1999, Ike conveyed to Maritta an undivided one-third interest in his oil and gas mineral interests in the McBee Company gas units in Upshur County, Texas. In the same deed, Ike conveyed an undivided two-thirds interest in his McBee mineral interests to his five children. In this deed, Ike reserved a life estate in the McBee mineral interests for himself. In an undated letter to his daughters, Ike instructed them to reconvey their mineral interests back to him due to a mistake in conveying the minerals, but indicated an intent to reconvey their interests back to them in the future. Deeds comprising Trial Exhibit Four reflect that, on December 31, 2001, January 7, 2002, and January 10, 2002, three of Ike's children conveyed their remainder interests in the McBee holdings back to Ike via quitclaim deed. Then, on January 28, 2002, Ike conveyed one-third of all his right, title, and interest in the McBee holdings to Maritta.
¶ 14. Two other deeds reflect further conveyances of mineral interests from Ike to Maritta. On January 10, 2001, Ike conveyed to Maritta an undivided one-third of his mineral interests in thirty-four and a half acres in Henderson County, Texas. On January 24, 2002, Ike conveyed to Maritta an undivided one-third of his mineral interests in certain land located in Jasper County, Mississippi.
¶ 15. In the judgment, the chancellor found that all the mineral interests titled in Maritta's name were Maritta's separate property. Ike had testified that, as to each conveyance, he had intended for the mineral interests to be Maritta's separate property. The court found that on direct and cross-examination, Ike "clearly and emphatically emphasized that he wanted Mrs. LaRue to have the interests in the minerals . . . conveyed to her." The court recognized that, late in the trial, Ike testified in rebuttal that he wanted the mineral interests returned to him. The court found from its observation of Ike that he intended for the mineral interests he conveyed to Maritta to be her separate property.
¶ 16. In the amended judgment, the chancellor modified his holding concerning the mineral interests. The chancellor determined from the transfers of mineral interests from Ike's children to Ike shown in Trial Exhibit Four and from Ike's later conveyance of one-third of his interest in the same property to Maritta that Maritta's one-third interest was commingled property subject to equitable distribution. The chancellor stated that
these transfers would not be subject to any alterations as a matter of equity when taking into consideration that neither party is receiving alimony, and when weighing the Ferguson factors in this case and all the circumstances, the mineral interests conveyed should remain unfettered and unchanged in Mrs. LaRue as her sole property. Therefore, *106 [Ike's] Motion to Alter or Amend in this aspect is denied.
¶ 17. From this Court's review of the deeds, the judgment, and the amended judgment, it is apparent that the chancellor found that Maritta's one-third interests in the oil rights in Henderson County, Texas and Jasper County, Mississippi, and her one-third remainder interest in the McBee property were all Maritta's separate property. The chancellor's amended judgment found that Maritta's one-third interest in Ike's interest in the McBee property was marital property due to commingling.
¶ 18. We proceed to review the chancellor's ruling, beginning with those mineral interests which the chancellor deemed to be Maritta's separate property. Ike argues that the chancellor should have classified those mineral interests as marital property because they were interspousal gifts acquired by Maritta from Ike during the marriage. In support of his argument, Ike cites our holding in Myrick v. Myrick, 739 So.2d 432, 434(¶ 5) (Miss. Ct.App.1999) that "interspousal transfers of marital property during the marriage may not be used to support a claim that the transfer was a gift intended to deprive the property of its status as a marital asset."
¶ 19. In Johnson v. Johnson, 650 So.2d 1281, 1286 n. 1 (Miss.1994), the supreme court recognized that property clearly obtained by one spouse through gift or inheritance is nonmarital property not subject to equitable distribution. See also Ferguson, 639 So.2d at 928 (holding that "property brought to the marriage by the parties and property acquired by inheritance or inter vivos gift by or to an individual spouse" are assets not ordinarily subject to equitable distribution, absent equitable considerations to the contrary.). In Myrick, the husband deeded his interest in the marital home to his wife during the marriage. Myrick, 739 So.2d at 434(¶ 5). The wife argued that, because the transfer vested title in her by gift, under the authority of Johnson, the home was part of her separate estate. Id. We rejected her argument, expressing that all the benefits of Hemsley's marital property presumption would be lost if a spouse could simply claim that the non-titled spouse had agreed to vest title in the spouse as a gift. Id. To avoid this result, we held that interspousal transfers of marital property could not support a claim that the transfer was a gift intended to render the property non-marital. Id.
¶ 20. Unlike the situation condemned in Myrick, in this case Ike's transfer of his mineral interests to Maritta was not an interspousal transfer of marital property. This is because Ike's mineral interests were inherited from his family and were undisputedly a part of his separate estate outside the marriage. The mineral interests Ike transferred to Maritta were a gift from a source outside the marriage, namely, Ike's separate estate. Therefore, they became Maritta's separate property pursuant to Johnson and Ferguson. Moreover, there was no indication that Ike's transfer of the mineral interests to Maritta converted the mineral interests into marital property through commingling or otherwise. Ike did not jointly title the mineral interests, but titled them solely in Maritta's name, evincing that it was in fact his intent that the property become a part of Maritta's separate estate. The testimony by Ike, accepted by the chancellor, substantiated the chancellor's finding that Ike intended the mineral interests transferred to Maritta to be Maritta's separate property. The chancellor was entitled to rely on Ike's testimony to that effect. The chancellor, "by his presence in the courtroom, was best equipped to listen to witnesses, observe *107 their demeanor, and determine the credibility of those witnesses and what weight ought to be ascribed to the evidence given by those witnesses." Rogers v. Morin, 791 So.2d 815, 826(¶ 39) (Miss. 2001) (quoting Carter v. Carter, 735 So.2d 1109, 1114(¶ 19) (Miss.Ct.App.1999)). The chancellor did not err by finding that the mineral interests were Maritta's separate property.
¶ 21. We next review the chancellor's finding in the amended judgment that Maritta's one-third interest in Ike's interest in the McBee property was marital property due to commingling. The chancellor found that the transfers from the children to Ike of their remainder interests rendered Ike's total interest in the McBee property marital property and, therefore, his later gift to Maritta of one-third of his interest was marital property subject to equitable distribution. Then, the chancellor found that, considering the Ferguson factors, all the circumstances, and the fact that alimony was not awarded in this case, Maritta's one-third interest in the McBee property should be awarded to Maritta.
¶ 22. Ike contends this ruling was error because the chancellor should have more thoroughly revisited the Ferguson factors and because the ruling was based in part upon an erroneous finding that alimony was not awarded in this case. Certainly, the chancellor erred in finding that no alimony was awarded, as periodic alimony was awarded to Maritta in the judgment. Nonetheless, we find no error in the chancellor's award of the one-third interest in the McBee mineral interests to Maritta. In the judgment, the chancellor carefully and thoroughly considered the Ferguson factors in dividing the parties' marital property to arrive at an arrangement that fairly and equitably provided for the maintenance of both elderly parties. The award of the one-third interest in the McBee mineral interests to Maritta was not clearly erroneous.
III. THE CHANCELLOR ERRED WHEN HE DID NOT EQUITABLY DIVIDE THE DEBT OF THE PARTIES AND AWARDED 100% OF THE DEBT TO IKE LARUE.
¶ 23. The chancellor found that Ike had unpaid income tax debt as well as ad valorem tax debt. Ike's son, William T. LaRue, testified as Ike's representative that Ike owed approximately $12,000 in income taxes for the years 2001, 2002, and 2003 and about $4,000 in ad valorem taxes on his mineral interests. William testified that Ike had an approximate $1,200 tax credit that would be put toward the $12,000 debt. Some of these ad valorem taxes had accrued as early as 1982. William testified that Ike had been setting aside about $200 per month to pay the ad valorem tax debt. In his finding on payment of these debts, the chancellor stated:
Payment of marital debts appears to be in conjunction with what each has incurred since the separation and pertains to their daily living expenses for which each shall be responsible. The payment of taxes [shall] be paid by the assessment made for severance and related taxes for the oil royalties individually held by the parties. The previous taxes assessed by the IRS and the taxes that will be due for the years in which the returns have not been made shall be the responsibility of Mr. LaRue.
¶ 24. The chancellor also ordered Ike to pay an $8,000 debt to Maritta's daughter, Susan Cutrer. Susan testified that she had loaned Ike and Maritta the $8,000 to pay overdue state income taxes to prevent threatened seizure of the marital residence. A promissory note from Ike to Cutrer dated June 11, 2002 reflects this loan. The chancellor found that this debt was Ike's obligation "because he had committed *108 to same by a separate contract and note written and signed which obligated Mr. LaRue to pay same to Mrs. Cutrer."
¶ 25. Ike argues that the chancellor's assignment of the income tax debt, ad valorem tax debt, and the Cutrer debt to Ike was inequitable. Regarding the Cutrer debt, Ike argues that because Cutrer testified that the loan was intended to benefit both Ike and Maritta, the chancellor erred by ordering Ike to repay the entirety of the loan. It has been held that debts incurred for the benefit of the marriage are marital. Prescott v. Prescott, 736 So.2d 409, 418(¶ 48) (Miss.Ct.App.1999). We find that Ike has failed to show manifest error in the chancellor's equitable division of the marital debt. A chancellor undertaking equitable division is not required to divide assets and debts equally. McLaurin v. McLaurin, 853 So.2d 1279, 1285(¶ 21) (Miss.Ct.App.2003). In this case, before assigning the debt to Ike, the chancellor considered each party's economic and domestic contributions, the disposal of marital assets, the market value of each party's separate and marital assets, and each party's mineral interest and Social Security income. Ike has failed to show that the chancellor's ordering him to pay the marital debt was not fair and equitable.
IV. THE CHANCELLOR ERRED BY NOT EQUITABLY DISTRIBUTING THE 50% EQUITABLE INTEREST IN THE MARITAL RESIDENCE IN A MANNER THAT WOULD GIVE IKE LARUE SOMETHING IN THE FORM OF AN ASSET OR SOME TYPE OF SET OFF.
¶ 26. In the amended judgment, the chancellor gave Maritta and Ike each a fifty percent interest in the debt-free marital home valued at $123,890, with Maritta to have exclusive use and possession of the home for her lifetime. Ike argues that giving Maritta exclusive use and possession for her lifetime was inequitable because Maritta will likely outlive Ike and thus he will receive no benefit from his fifty percent equitable interest in the home. Ike argues that this Court should reverse this case and remand for the chancellor to order Maritta to pay Ike the value of his fifty percent equitable interest.
¶ 27. The supreme court has approved of a chancellor's award of exclusive use and possession of the marital home for a period of time to a spouse based upon need. In Selman v. Selman, 722 So.2d 547, 552(¶ 17) (Miss.1998), the supreme court affirmed the chancellor's order for the wife to have exclusive use and possession of the marital home and to make the house payments until the child reached the age of majority, at which time the house was to be sold and the equity split with the husband. In this case, the chancellor expressed concern about the fact that both parties needed a place to live and money to take care of themselves due to their poor health and advanced age. The chancellor observed that Ike cannot live without assistance and lives in a retirement home. The court obviously was concerned about preserving Maritta's living situation as well. We find that, given the facts before the court concerning Maritta's age and disabling health conditions and all the other evidence, the chancellor did not err by fashioning a remedy that enabled both parties to remain in their respective residences.
V. THE CHANCELLOR ERRED IN THE MANNER HE DISREGARDED FACTOR TWO OF THE FERGUSON FACTORS WHEN HE DETERMINED THERE WAS NO DISSIPATION OF MARITAL ASSETS BY ONE PARTY MORE THAN ANOTHER.
*109 ¶ 28. Next, Ike argues that the chancellor disregarded the second Ferguson factor by determining that neither party dissipated more marital assets than the other. The second Ferguson factor requires the chancellor to consider "the degree to which each spouse has expended, withdrawn or otherwise disposed of marital assets and any prior distribution of such assets by agreement, decree or otherwise." Ferguson, 639 So.2d at 928. The testimony established that during the marriage both Ike and Maritta frequently gambled at several local casinos. Records from the casinos were admitted into evidence showing that the LaRues lost approximately $115,000 at the casinos from 1995 to 2003. This amount exceeded the parties' reported income and the source of these funds was not established at trial.
¶ 29. Ike contends that the chancellor ignored the casino records which Ike asserts showed that Maritta lost $113,520 while Ike lost only $5,348. Ike contends that the chancellor should have attributed most of the losses to Maritta. Ike argues that most of the losses were from slot machines, which he testified he did not like to play. He testified that Maritta liked to play the slot machines. Maritta testified that she was not responsible for all of the losses attributable to her in the casino records because Ike used her player's cards and, therefore, Ike's gambling losses would have been recorded as hers. Ike testified that he frequently played blackjack, entered blackjack tournaments, and occasionally played the slot machines. Maritta testified that she had managed the parties' finances since 1995 and routinely gave checks or cash to Ike for gambling.
¶ 30. We quote from the chancellor's holding regarding this factor:
There is some question as to where the $100,000 plus came from which is well documented as a gambling loss. The question is, there is some income that came from somewhere, from some account or earnings, but it has not been explained. Therefore, the court will not wager a guess. The fact that has been clear, as shown by Exhibits # 51, # 53 and # 90, the parties gambled significantly from 1995 to 2002. During one period of time, between 1999 and 2003, they lost over $100,000 (Exhibit # 57). [Ike] LaRue's losses during this time have been shown in Exhibit # 90 as $5,348. Exhibit # 57 shows $113,520.45 was lost by these parties from 1999 through November 2003, and each blames the other for the loss. Mr. LaRue indicates that he did not use Mrs. LaRue's card, and Mrs. LaRue indicates that he used her card and did not always play blackjack while she played the slots. Exhibit # 53, furnished by Grand Casino under subpoena of counsel for Mr. LaRue, reflects that Mrs. LaRue wrote checks for as much as $500 each, periodically and very close together. She contends however this came from money deposited into her account by she and her husband, and not all of this was in fact her losses because she was writing checks for Mr. LaRue. She contends that Mr. LaRue enjoyed gambling; he went weekly, almost daily at times. She indicated that if she did not go, he pouted with her. Nevertheless, the court cannot say under this controverted testimony and evidence that one party dissipated and lost this money more than any other.
¶ 31. The chancellor's ruling reflects that he considered and weighed all of the exhibits and testimony and declined to attribute the losses solely to Maritta. From this Court's review of the exhibits and testimony, the chancellor's findings and conclusion as to this factor are supported by substantial evidence. The chancellor *110 did not manifestly err by declining to find that Maritta had dissipated assets to a greater degree than had Ike.
VI. THE CHANCELLOR ERRED IN AWARDING $700 PER MONTH PERIODIC ALIMONY TO MARITTA LARUE.
¶ 32. Ike contests the chancellor's award of alimony to Maritta in the amount of $700 per month. The decision to award alimony is largely within the chancellor's discretion. Gray v. Gray, 562 So.2d 79, 83 (Miss.1990). We will not disturb an alimony award unless it is against the overwhelming weight of the evidence or is manifestly erroneous. Parsons v. Parsons, 678 So.2d 701, 703 (Miss.1996).
¶ 33. To determine whether to award permanent periodic alimony, the chancellor must consider the twelve factors enumerated in Armstrong v. Armstrong, 618 So.2d 1278, 1280 (Miss.1993):(1) the parties' income and expenses; (2) the parties' health and earning capacities; (3) each party's needs; (4) each party's obligations and assets; (5) the length of the marriage; (6) the presence or absence of minor children in the home, which may require that one or both of the parties either pay, or personally provide, child care; (7) the parties' age; (8) the parties' standard of living, both during the marriage and at the time of the support determination; (9) the tax consequences of the spousal support order; (10) fault or misconduct; (11) wasteful dissipation of assets by either party; and (12) any other factor deemed by the court to be "just and equitable" in connection with the setting of spousal support. Armstrong, 618 So.2d at 1280. In determining the alimony award, the chancellor should consider the wife's reasonable needs and the husband's right to lead as normal a life as possible with a decent standard of living. Gray, 562 So.2d at 83.
¶ 34. The chancellor found that the equitable division of assets had left inadequate provision for Maritta. See Ferguson, 639 So.2d at 928. The chancellor made lengthy findings on each applicable Armstrong factor. The chancellor observed that Maritta owned the marital property, a 1994 Honda Accord, furniture, and some life insurance with no cash value. She had a credit card debt of $50. The court noted that Maritta's health was poor, she had lost work skills, and she could no longer work. The court noted Maritta's testimony that she quit working when she was married at Ike's request. The court stated that Maritta had used $25,000 of her savings for repairs to their first home and for groceries.
¶ 35. The court stated that Ike was living at a retirement home and had multiple health conditions, including Parkinson's disease and dementia, which his physician indicated would worsen. Ike pays $2,545 for Sunnybrook and $400 per month toward a $1,400 dental bill. Ike has monthly medical expenses. Additionally, the court acknowledged Ike's tax debt of $12,000 and his ad valorem tax debt of $4,000. The court noted Ike's balances in his two bank accounts of $1,100 and $2,740. Also, Ike owed severance taxes of up to $600 per year, owed the IRS $200 per month, and paid an additional $100 per month in taxes.
¶ 36. The court found that the length of the marriage was twenty-two years and the parties had enjoyed a good standard of living. The court found that the tax consequences of the spousal support "would involve Mrs. LaRue's alimony being income to her for which she would pay ordinary income tax as well as whatever severance tax and oil tax that may be imposed, same as to Mr. LaRue." The court found that fault was difficult to determine and not an issue.
*111 ¶ 37. The chancellor found from Maritta's financial statement that her monthly income was $2,178 with combined monthly expenses of $3,069. Ike's financial statement showed a monthly income of $6,806.54 and combined monthly expenses of $6,115 with an $692 difference. The court awarded $700 per month permanent periodic alimony to Maritta approximately reflecting the difference between Ike's combined expenses and his monthly income. The chancellor stated that this award allowed Ike's expenses to be met and was within $141 of Maritta's expenses. In making the award, the chancellor also considered Ike's $8,000 debt to Cutrer as well as Maritta's equity in the house.
¶ 38. On appeal, Ike complains that certain of Maritta's expenses on the financial declaration were inflated. Ike points out that Maritta listed a $400 per month car note though her car was paid for. However, Maritta testified that the car had high mileage and that she had to buy a new car. Ike attacks other aspects of Maritta's financial declaration and argues that some of her expenses were not credible, such as $150 per month for home maintenance and $80 per month for yard work. Ike argues that other figures should not have been relied upon by the chancellor because Maritta had given lower values in her first financial declaration or deposition. For example, in her deposition, Maritta claimed $305 per month for life insurance, but declared $467 per month in the later financial declaration. Maritta was unable to explain this change at the trial.
¶ 39. We find that Ike has failed to show that Maritta's expenses were so unreasonable or incredible that the chancellor should have rejected them. Ike also argues that the chancellor should have relied upon a defense exhibit estimating Maritta's mineral interest income at $2,311.06 per month. However, the chancellor was within his discretion in rejecting that exhibit and in relying upon Maritta's estimation of her mineral interest income, which was supported by other documentary exhibits and testimony.
¶ 40. We find that the periodic alimony award was within the chancellor's discretion. The chancellor examined Maritta's financial declaration and found that, given her assets, there would be no way for her to meet her expenses without alimony. The chancellor found that Maritta could not work due to her health problems. There was a significant disparity between Ike's and Maritta's mineral interest income. The chancellor stated that his goal in this property division was to "painstakingly strike an equitable balance" in arranging these parties' affairs given their ages, health, and income situations. The alimony award equaled the difference between Ike's monthly expenses and income. The award was not against the overwhelming weight of the evidence nor manifestly erroneous.
VII. THE CHANCELLOR ERRED IN AWARDING MARITTA LARUE'S ATTORNEY'S FEES.
¶ 41. Both Ike and Maritta requested attorney's fees. Maritta submitted an itemized bill for attorney's fees in the amount of $12,484.12. The chancellor considered the factors announced in McKee v. McKee, 418 So.2d 764 (Miss.1982), and awarded Maritta $10,000 in attorney's fees, which he later reduced to $7,000. In reducing the amount, the court stated:
It is true that both have living expenses and costs and that their incomes are limited. The court wrestled with this issue in the original ruling. However, a review of the costs that Mr. LaRue will pay such as the note due to Mrs. Cutrer, his half of the taxes previously assessed to him, dental bills, income tax, ad valorem taxes, and the Sunnybrook costs as *112 well as the free use and equity of the house by Mrs. LaRue and her income, the court is of the opinion the attorney fees should be adjusted. . . .
The court credited Ike with $88.08 for half the equity in the Honda vehicle minus the unpaid insurance and homestead taxes that he was ordered to pay in an earlier judgment. This left a balance due from Ike for attorney's fees in the amount of $6,912.
¶ 42. The award of attorney's fees in divorce cases is left to the discretion of the chancellor, assuming the chancellor follows the appropriate standards. Creekmore v. Creekmore, 651 So.2d 513, 520 (Miss.1995). In Langdon v. Langdon, 854 So.2d 485, 495-96(¶ 40) (Miss.Ct.App. 2003), we stated:
"The general rule is that if a party is financially able to pay his attorney fees he should do so, though this is a matter which is entrusted to chancellor's sound discretion." Labella v. Labella, 722 So.2d 472, 475(¶ 13) (Miss.1998). In assessing the appropriateness of an award, the chancellor should consider the relative financial ability of the parties. McKee v. McKee, 418 So.2d 764, 767 (Miss.1982). "[W]here the record shows an inability to pay and a disparity in relative financial positions of the parties, there is no error in awarding attorney's fees." Bates v. Bates, 755 So.2d 478, 482(¶ 11) (Miss.Ct.App.1999). Additionally, the chancellor should consider "the skill and standing of the case and novelty and difficulty of the questions at issue, as well as the degree of responsibility involved in the management of the cause, the time and labor required, the usual and customary charge in the community, and the preclusion of other employment by the attorney due to the acceptance of the case." McKee, 418 So.2d at 767.
¶ 43. Ike argues that the award of attorney's fees was error because Maritta failed to show inability to pay. A party's assets awarded in the divorce decree may be considered in determining ability to pay. Hankins v. Hankins, 729 So.2d 1283, 1286(¶ 13) (Miss.1999). Ike contends that Maritta had the ability to pay her attorney's fees because she was awarded a half interest in the equity in the marital home, totaling $62,000. Ike avers that Maritta could sell her mineral interests, valued at $48,000, in order to pay the costs of her representation.
¶ 44. We find that the evidence previously detailed concerning Maritta's income, expenses, age, and inability to work supports the chancellor's finding that Maritta lacked the ability to pay her attorney's fees. And, the chancellor did not abuse his discretion in failing to make Maritta liquidate her mineral interests because those interests are her primary source of regular income. Considering the argument that Maritta could pay the fees with a loan secured by her home equity, we observe that Maritta's monthly expenses are higher than her income which would severely hamper her ability to repay a loan. See Hemsley, 639 So.2d at 915. We affirm the chancellor's award of attorney's fees to Maritta.

ISSUE ON CROSS-APPEAL
I. THIS COURT SHOULD AWARD APPELLEE ATTORNEY'S FEES DUE TO THIS APPEAL PERFECTED BY APPELLANT.
¶ 45. On May 8, 2005, Maritta filed a motion for the Court to award her the attorney's fees she has incurred in defending this appeal. She has assigned this issue on cross-appeal. However, Maritta cites no authority for entitlement to attorney's fees for defending an appeal. Therefore, in accord with Lauro v. Lauro, *113 847 So.2d 843, 851(¶ 21) (Miss.2003), we are precluded from considering the issue.
¶ 46. THE JUDGMENT OF THE CHANCERY COURT OF JACKSON COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., LEE AND MYERS, P.JJ., IRVING, GRIFFIS, ISHEE, ROBERTS AND CARLTON, JJ., CONCUR. BARNES, J., NOT PARTICIPATING.