# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2014-CA-01043-COA

**CLINT D. FERRARA**                                                    **APPELLANT**

v.

**MELISSA KAY BOWERS FERRARA, MARCUS**                    **APPELLEES**
**BOWERS AND MARY CAROLE BOWERS**

| | |
|---|---|
| DATE OF JUDGMENT: | 05/19/2014 |
| TRIAL JUDGE: | HON. EDWARD C. PRISOCK |
| COURT FROM WHICH APPEALED: | RANKIN COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | JAMES CHRISTOPHER WALKER |
| ATTORNEYS FOR APPELLEES: | G. MICHAEL MASSEY |
| | MATTHEW STANLEY EASTERLING |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| TRIAL COURT DISPOSITION: | GRANTED MARCUS AND MARY CAROLE BOWERS AN EQUITABLE LIEN ON CLINT AND MELISSA FERRARA'S MARITAL HOME, ORDERED THE FERRARAS TO REPAY THE MONEY BORROWED FROM MELISSA'S TRUST FUND, GRANTED CLINT A DIVORCE ON THE GROUND OF UNCONDONED ADULTERY, DISTRIBUTED THE MARITAL ESTATE, AWARDED CLINT PRIMARY PHYSICAL CUSTODY OF THE TWO MINOR CHILDREN, AND ORDERED MELISSA TO PAY $780 IN CHILD SUPPORT |
| DISPOSITION: | AFFIRMED - 04/12/2016 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE IRVING, P.J., BARNES AND ISHEE, JJ.**

**IRVING, P.J., FOR THE COURT:**

¶1.    Clint Ferrara appeals from a final judgment[1] of the Chancery Court of Rankin County, in which he was granted a divorce from Melissa Kay Bowers Ferrara and ordered to pay certain financial obligations incurred during the marriage.  We are called upon to decide whether the chancellor erred in (1) finding that certain financial transactions resulted in the accumulation of marital debts, (2) failing to identify and classify all of Melissa's separate assets, and (3) failing to properly weigh Melissa's responsibility for the destruction of the marriage when dividing the marital estate.  We are also called upon to decide whether the chancellor properly calculated Melissa's gross income for purposes of the child-support award.

¶2.    Finding no error, we affirm.

**FACTS**

¶3.    Clint and Melissa were married on October 26, 1996, and two children were born to the marriage: Amanda, born December 8, 1998, and Kayla, born December 15, 2003.  About a year after the marriage, Clint and Melissa borrowed money from Melissa's trust fund, of which Melissa's mother, Mary Carole Bowers, served as trustee.  Clint and Melissa used this money[2] to purchase a house in South Carolina, where they lived until they decided to relocate to Brandon, Mississippi.  There, Clint, Melissa, and their children initially lived with Mary Carole and Marcus Bowers—who is Melissa's father and Mary Carole's husband—in a

---

[1] The final judgment incorporated five previous judgments of the chancery court in this case.

[2] Clint and Melissa combined the funds derived from the trust with other funds in order to purchase the South Carolina house.

2

house located at 105 Beaver Run in Brandon. We will refer to Mary Carole and Marcus collectively as the Bowerses unless individual identification is required, and we will sometimes refer to the property and the improvements located at 105 Beaver Run as the Beaver Run house or the house.

¶4. When Clint and Melissa moved into the Beaver Run house, it was owned by the Bowerses. However, after the Bowerses purchased a house located in Flowood, Mississippi, they relinquished possession of the Beaver Run house to Clint and Melissa. At that time, Clint and Melissa gave the Bowerses $125,000, and the Bowerses deeded the Beaver Run property and the improvements situated on the property to Clint and Melissa. Prior to the transfer of ownership, the house had been listed for sale through a realtor for $350,000.

¶5. Clint and Melissa separated on or around July 5, 2011, after he learned that she had had an affair. About a week after the separation, on July 12, 2011, he filed a complaint for divorce, alleging uncondoned adultery. When Clint filed the complaint, he, Melissa, and their children were still living in the Beaver Run house, and, in an amended complaint, he requested temporary exclusive use and possession of the house. After that, on April 12, 2012, the Bowerses sent Clint and Melissa a letter,[3] demanding payment in the amount of $225,000 for the balance owed on the Beaver Run house. So, on April 26, 2012, in a separate case, Clint filed a complaint for injunctive relief[4] against the Bowerses, asking the

[3] During trial, Melissa testified that although she did not receive the demand letter, she later received a follow-up letter from the Bowerses that referenced the demand letter.

[4] In the motion, Clint argued that (1) the statute of frauds barred the Bowerses' demand for payment because the terms of the sale were not reduced to writing; (2) the Bowerses' claims were barred by the applicable statute of limitations; and (3) the Beaver

3

chancellor to find that he and Melissa owned the house. Melissa was later joined as a defendant in that litigation.

¶6. The chancellor consolidated the two cases, and a bifurcated trial ensued. After the trial, the chancellor found that (1) the Bowerses were entitled to an equitable lien on the Beaver Run house and that the lien secured a marital debt in the amount of $225,000; and (2) the money borrowed from the trust constituted a marital debt in the amount of $125,000. After awarding Clint primary physical custody of the children, the chancellor also ordered Melissa to pay child support in the amount of $780 per month.

## STANDARD OF REVIEW

¶7. "This Court will not disturb the findings of [a] chancellor unless the chancellor was manifestly wrong or clearly erroneous, or applied the wrong legal standard." *Pratt v. Nelson*, 170 So. 3d 620, 623 (¶11) (Miss. Ct. App. 2015) (citing *McNeil v. Hester*, 753 So. 2d 1057, 1063 (¶21) (Miss. 2000)). "The standard of review for the chancellor's decision is abuse of discretion." *Id*. "For questions of law, the standard of review is de novo." *Id*. (citation omitted).

## DISCUSSION

### I. Marital Debts

¶8. "In divorce cases, property division is governed by the law articulated in *Hemsley v. Hemsley*, 639 So. 2d 909 (Miss. 1994)[,] and *Ferguson v. Ferguson*, 639 So. 2d 921 (Miss. 1994)." *Larue v. Larue*, 969 So. 2d 99, 104 (¶11) (Miss. Ct. App. 2007). "Fairness is the

---

Run house was a gift to him and Melissa from the Bowerses. On appeal, Clint has abandoned the first and second arguments.

prevailing guideline in marital division." *Id*. (citation omitted). "The chancellor's first step is to classify each asset as marital or non-marital[, and n]ext, the chancellor must determine the fair market value of the assets and equitably divide the marital property according to the factors listed in *Ferguson*." *Id*. (citation omitted).

### A. Equitable Lien

¶9. Clint asserts that the Bowerses gifted the Beaver Run house to him and Melissa and that there is insufficient credible evidence to support a finding that the Bowerses are entitled to an equitable lien on the house. In the alternative, he insists that there is insufficient evidence establishing the amount of his and Melissa's indebtedness to the Bowerses or that the Bowerses had a reasonable expectation of payment. Clint avers that there is also insufficient evidence to support a finding that he was aware of any negotiations between the Bowerses and Melissa concerning the purchase of the house or of the terms of the purchase agreement made between them. He contends that by awarding the Bowerses the equitable lien, the chancellor significantly reduced the value of the marital estate. In the alternative, he insists that this case should be remanded for a determination of the terms of repayment of the $225,000 balance. In response, Melissa insists that the Bowerses deeded the Beaver Run property to her and Clint based on the Bowerses' understanding that she and Clint would pay the $225,000 balance when they became financially capable of doing so. She also insists that Clint did not meet his burden of proving that the house was a gift.

¶10. On February 3, 2006, Melissa signed two checks that were written on her and Clint's joint checking account: (1) check number 1220 in the amount of $75,000, and (2) check

5

number 1221 in the amount of $50,000. Both checks were made payable to the Bowerses. The record reveals that the notation on check number 1220 reads "to purchase home," and the notation on check number 1221 reads "to purchase house – 105 Beave[r] Run." On April 10, 2006, the Bowerses deeded the Beaver Run property to Clint and Melissa.

¶11. During trial, Melissa testified that she had prepared the deed that granted her and Clint the Bowerses' interest in the Beaver Run property, and she admitted that the deed had not been recorded until on or around December 19, 2006. Melissa also admitted that in two applications for a home-equity line of credit, she had failed to disclose that she and Clint owed any debt on the Beaver Run house. Melissa testified that although there was no written agreement between her, Clint, and the Bowerses governing the sale of the house, she and Clint had paid the $125,000 as the down payment for the house by way of check numbers 1220 and 1221. Melissa also testified that because the sale price for the house was $350,000, she and Clint still owed a balance of $225,000. She insisted that they had purchased the Beaver Run house after several informal discussions between her, Clint, and the Bowerses. Melissa also insisted that the house was not a gift from the Bowerses to her and Clint.

¶12. During her testimony, Mary Carole, too, admitted that there was no written agreement governing the sale of the Beaver Run house. She stated that she had not believed that a written agreement was necessary due to the nature of her relationship with Clint and Melissa. She also admitted that the April 12, 2012 demand letter was the first and only written demand for payment made to Clint and Melissa. Mary Carole testified that she and Marcus had not intended to gift the house to Clint and Melissa. According to Mary Carole, the parties'

6

verbal agreement was that Clint and Melissa would pay the $225,000 balance when they became financially capable of doing so.

¶13. Clint testified that he was never involved in any discussions with the Bowerses concerning the purchase of the Beaver Run house. He also testified that he and Melissa had given the Bowerses the $125,000, so that the Bowerses could use the money to purchase the house in Flowood. Clint admitted that the notations on check numbers 1220 and 1221 indicated that they were payments for the Beaver Run house, but he denied having any definite information about the sale at the time that it took place or at the time that the checks were tendered to the Bowerses.

¶14. On February 7, 2006, days after Clint and Melissa had tendered the $125,000 payment to the Bowerses, Clint sent the following email to a real estate agent:

> You can hold off the home search for [Melissa and I] at this time. The [Bowerses] have successfully secured [the] foreclosure I mentioned last week. That means they have beat us to the punch in the purchase of a new residence. We will be purchasing (and fixing) their home -- the one we are in now. [This was] not the route we wanted to take, but it is before us, and we will do our best to make the house sellable [in] the future. . . .

During his cross-examination, Clint stated that he had informed the agent that he and Melissa were "purchasing" the Beaver Run house because he "didn't feel comfortable telling the realtor that [he] was going to be gifted a home [because it was] just not the language [he] would have used with a realtor." Also on cross-examination, Clint admitted that when he was asked in an interrogatory to identify "any and all property . . . [he] acquired by gift from either Melissa or anyone else . . . during [his] marriage to Melissa," he responded by stating that he did "not recall any gifts from Melissa or anyone else that cost over $200[]," other than

7

a grill, a plasma television, and a vacuum. He also stated that Melissa had not informed him of the house purchase until "[s]ometime in 2008." After that, he was asked to read from an affidavit signed by him that stated that Melissa "told [him] in late 2010 that [they] owed [the Bowerses] $225,000." Clint maintained his position that the house was a gift or, alternatively, that he was not a party to the sale.

¶15.    Marcus testified that he was not "in the habit" of making substantial gifts to Melissa and that he and Mary Carole did not gift the Beaver Run house to her and Clint. He also testified that he and Mary Carole never agreed to gift the remaining $225,000 balance on the house to Clint and Melissa.

¶16.    The chancellor found:

> [T]his case is an example of unjust enrichment. Here, the marital estate of the Ferraras would be enriched by the value of the equity in the [the] Beaver Run [house] in the total amount of the loans made to purchase [the house]. Here, allowing the marital estate of the Ferraras to retain title to the property . . . would result in unjust enrichment of the marital estate. The Ferraras['] marital estate, according to the credible evidence of the Bowers[es], was deeded [the] Beaver Run [property] as a part of an agreement between the Ferraras and the Bowers[es] that the Ferraras would pay the Bowers[es] $225,000 for the property, when they were financially able to do so. To allow the marital estate of the Ferraras to retain [the house] without repaying the Bowers[es] the $225,000 would be contrary to equity and good conscience.
>
> ****
>
> This [c]ourt does not find a gift occurred. Further, this [c]ourt is of the opinion that the evidence is sufficient to warrant the imposition of an equitable lien in favor of the Bowers[es] in the amount of $225,000 against [the] Beaver Run [house and property].

¶17.    We first address Clint's contention that the Beaver Run house was a gift from the Bowerses to him and Melissa. This Court has recognized that "[g]ifts of real property

8

between family members are a normal occurrence[.]" *In re Estate of Summerlin*, 989 So. 2d 466, 477 (¶37) (Miss. Ct. App. 2008) (citation omitted). However,

> [a] party attempting to prove that an inter vivos gift was made must show . . . by clear and convincing evidence [that]: (1) . . . the donor was competent to make a gift; (2) . . . the donation was a voluntary act and the donor had donative intent; (3) . . . the gift [was] complete and not conditional; (4) . . . delivery was made; and (5) . . . the gift was irrevocable.

*In re Estate of Ladner*, 909 So. 2d 1051, 1054 (¶9) (Miss. 2004) (citation omitted). In this case, the Bowerses' competence to make a gift is not contested, and it is clear that delivery was made. So the first and fourth prongs of the analysis are not at issue. However, there was evidence presented during trial to support a finding, under the second prong of the analysis, that the Bowerses did not have the donative intent required for us to classify the transfer in possession of the Beaver Run house as a gift. More specifically, the Bowerses testified that they had not intended to gift the house to Clint and Melissa. Also, there was substantial evidence to support a finding, under the third prong of the analysis, that the transfer in possession was conditioned upon the payment, by Clint and Melissa, of the $225,000 balance. And because the evidence does not establish that the Bowerses gifted the house to Clint and Melissa, the fifth prong of the analysis is rendered moot. As such, we find that the chancellor did not err in finding that the Bowerses did not gift the Beaver Run house to Clint and Melissa, and, as discussed below, we also find that the chancellor did not err in granting the Bowerses an equitable lien on the house.

¶18.    In a strikingly similar case, *Neyland v. Neyland*, 482 So. 2d 228, 229 (Miss. 1986), which the chancellor cited as support for the equitable-lien award, the husband's parents

9

loaned him and his wife money to have a house built. Because the parents understood that the couple was not able to immediately repay the loan, they did not establish a repayment schedule. *Id*. However, the parties agreed that the loan would be repaid whenever the couple could afford repayment or whenever the parents were in need of it. *Id*. After the house was built, it became evident to the parents that the couple was on the verge of a divorce, and, apparently, at that time, no payments had been made on the loan. *Id*. So the parents filed a complaint, seeking a lien upon the house and repayment of the loan, plus interest. *Id*. In granting the lien, the Mississippi Supreme Court noted:

> While in the usual case an equitable lien is impressed to reflect an express agreement that the property to be liened was intended to be held as security for the obligation of the promisor, . . . a lien may also be impressed out of recognition of general equitable principles of right and justice. . . .
>
> A principal reason for impressing an equitable lien is to prevent unjust enrichment, i.e., where it would be contrary to equity and good conscience for an individual to retain a property interest acquired at the expense of another.

*Id*. at 230 (quoting *Branca v. Branca*, 443 A.2d 929, 931 (Del. 1982)).

¶19.    As discussed, in this case, there was substantial evidence to support a finding that Clint and Melissa intended to purchase the house from the Bowerses, with the agreement that they would make payments toward the purchase when they were financially able to do so. To be clear, we do not find that an equitable lien operates to remove a verbal contract that should have been reduced to writing from the purview of the statute of frauds. However, because Clint does not raise a statute-of-frauds argument on appeal, we simply hold that there was substantial evidence supporting the award of the equitable lien.

¶20.    Further, we do not find that this case should be remanded for a determination of the

terms of the repayment of the $225,000 balance. In equitably dividing the property, the chancellor discharged his duties under *Hemsley* and *Larue* by (1) classifying the balance as a marital debt; (2) determining that the value of the debt was $225,000; and (3) dividing the debt, finding that it "shall be shared equally by [Clint and Melissa]." Clint cites no authority to support his argument that the chancellor should have established the terms of the repayment of the debt. We, therefore, pretermit further discussion of it. *Funderburg v. Pontotoc Elec. Power Ass'n*, 6 So. 3d 439, 442 (¶9) (Miss. Ct. App. 2009) ("[F]ailure to cite any authority in support of a claim of error precludes this Court from considering the specific claim on appeal."). This issue is without merit.

### B. Trust Loan

¶21. Clint insists that his and Melissa's loan from the trust is not a "legitimate debt" and that there was no reasonable expectation of repayment of the loan. Rather, Clint argues that the funds were a gift to Melissa, and the funds were commingled and converted to marital property when he and Melissa used the money to purchase the South Carolina home. Clint also contends that this Court lacks jurisdiction to adjudicate any claims the trust may have against him and Melissa because it is not a party to this litigation. In response, Melissa insists that Clint's arguments fail because the money they borrowed from the trust was not a gift to her or an inheritance, and she highlights the fact that she and Clint made payments toward the debt they owed to the trust. Melissa asserts that the chancellor correctly left the issue of the repayment of the trust debt to be decided in separate litigation.

¶22. During trial, Melissa testified that in 1997, Mary Carole disbursed money from the

11

trust to her and Clint and that they used the money to purchase the house in South Carolina, which had a list price of $156,000. The record reveals that the disbursement check was written out to Clint and Melissa in the amount of $148,000 and that it contained a handwritten notation that stated: "loan/distribution." Although Melissa admitted that there was no written agreement governing the loan, she testified that between 1997 and 1998, she and Clint had made several payments to the trust. According to her, at the time of trial, the balance on the loan was approximately $129,000.

¶23. During her testimony, Mary Carole admitted that there was no promissory note governing the transaction between Clint, Melissa, and the trust because she had not believed that a promissory note was necessary. Mary Carole also admitted that she had not made a written demand for repayment of the trust loan. She stated that although the money from the trust was in fact a loan, after Clint and Melissa sold their house in South Carolina, she had not demanded that they deposit the proceeds from the sale into the trust account because she had known they would need the money to purchase a house in Mississippi.

¶24. Clint testified that although he and Melissa had borrowed money from the trust to purchase the house in South Carolina, he had only agreed to borrow it because Melissa had "assured [him] that it was her discretion to pay it back on an ability basis. And [he] knew [they] could pay something back as long as [he] was employed, and [they] would be able to make those payments." Clint agreed that he and Melissa had made payments to the trust in efforts to repay the loan, but he testified that there had never been a demand, either verbal or written, for repayment of the loan.

12

¶25. The chancellor found that Clint and Melissa owed the trust $125,000 and concluded "that the debt owed to the trust benefitting Melissa in the amount of $125,000 shall be equally shared by [them,] and the issue of a payment plan is between the trust and the parties." Upon review, based upon the testimony set forth above, we find substantial evidence to support the chancellor's findings. The testimony, as well as Clint and Melissa's payments made toward reimbursing the trust, negates a finding that the money was a gift or disbursement. *See Hankins v. Hankins*, 729 So. 2d 1283, 1287 (¶17) (Miss. 1999) (stating that an inter vivos gift must be gratuitous and complete with nothing left to be done). Also, we find no merit to Clint's argument that the chancellor erred in deciding issues concerning the trust because it is not a party to this litigation. As stated, the chancellor was charged with classifying, valuing, and dividing the parties' assets. After he classified the debt owed to the trust as marital, he rightfully moved to the second step of his analysis and valued the debt. And the chancellor properly completed his analysis by distributing the debt equally between the parties. This issue is without merit.

## II. *Melissa's Separate Property*

¶26. Clint argues that the chancellor erred in failing to classify as marital property (1) a house allegedly purchased by Melissa during the course of this litigation and located at 602 Turquoise Court in Flowood and (2) trust distributions that Melissa allegedly receives on a regular basis. Yet again, he insists that the chancellor's failure to so classify the alleged assets warrants reversing and remanding this case for reclassification of the parties' assets and redistribution of the marital estate. In response, Melissa insists that the record does not

support Clint's arguments.

¶27. In her financial-disclosure statement submitted under Rule 8.05 of the Uniform Chancery Court Rules, Melissa did not list a home located in Flowood as an asset, and during trial, there was no testimony adduced from either party about the alleged house. Notwithstanding the absence of any mention or evidence of Melissa's alleged purchase of a new home, in his motion to alter or amend the judgment, Clint argued that the chancellor had "failed to account for Melissa's new home[,] . . . as well as the contents therein."

¶28. Melissa also did not list any trust distributions in her financial-disclosure statement, and during trial, there was scarce testimony relating to any trust distributions. When asked by his attorney whether Melissa had "received trust distributions that had to be recorded as income on her income taxes," Clint responded: "Yes. I didn't see anything in our taxes for [20]07, [20]08[,] [20]09[,] or 2010." Clint also vaguely testified that during the marriage, "there was more money than what was being reported." He further testified that Melissa had once assured him that if he quit his job, their financial obligations would be taken care of with money acquired from her trust. Melissa testified that "maybe twice," Mary Carole had made "a distribution from the trust to [her] and Clint" to help them meet their financial obligations. She also testified that Mary Carole had "paid for [her and Clint's] wedding out of [her trust]."

¶29. Clearly, Clint's allegations concerning Melissa's undisclosed assets are unsupported by the evidence. As such, we find that the chancellor did not abuse his discretion by failing to identify and classify those alleged assets. This issue is without merit.

### III. Marital Fault

¶30. Clint asserts that the chancellor's failure to assign proper weight to Melissa's marital misconduct under the first and eighth factors of the *Ferguson* analysis is reversible error. He avers that he "filed for divorce . . . shortly after learning of Melissa's adulterous relationship . . . , which evidences the impact Melissa's adultery had on the harmony and stability of the marriage." In response, Melissa insists that the chancellor's consideration of her marital fault is evidenced by the fault-based divorce and the fact that Clint was awarded primary physical custody of the children.

¶31. In ordering an equitable distribution of property, "[a] chancellor is required to make findings of fact regarding all applicable *Ferguson* factors." *Lowrey v. Lowrey*, 25 So. 3d 274, 285 (¶26) (Miss. 2009) (citation omitted). "Marital fault is relevant to the chancellor's consideration of equitable distribution when it impacts upon the harmony and stability of the marriage." *Jones v. Jones*, 155 So. 3d 856, 863 (¶26) (Miss. Ct. App. 2013) (citation omitted).

¶32. *Ferguson* sets forth eight factors for chancellors to consider during the equitable-distribution process. *Lowrey*, 25 So. 3d at 286 (¶28). The first factor mandates consideration of the parties'

> [s]ubstantial contribution[s] to the accumulation of the property. Factors to be considered in determining contribution are as follows:
>
> > a. Direct or indirect economic contribution to the acquisition of the property;
> >
> > b. Contribution to the stability and harmony of the marital and family relationships as measured by quality, quantity

15

> of time spent on family duties and duration of the marriage; and

> c.    Contribution to the education, training or other accomplishment bearing on the earning power of the spouse accumulating the assets.

*Id*. The eighth factor allows chancellors to consider "[a]ny other factor which in equity should be considered." *Id.*

¶33.    Here, the chancellor made findings under the first through the seventh factors. However, he failed to discuss the eighth factor, obviously finding no other factors which in equity should have been considered. Under the first factor, the chancellor found:

> It appears that equal contributions to the accumulation of marital property were made by Clint and Melissa. This conclusion is based on the fact that Clint was the primary caregiver to the children and [a] stay-at-home dad, and Melissa is and was the primary breadwinner[,] especially during the time after the move to Mississippi.

There was substantial evidence supporting the chancellor's finding under this factor. And "[w]hile it is true that [Melissa's] . . . admission of the affair [may have] led to the actual end of the marriage, it was not of such nature that a failure to expressly consider it in the application of the *Ferguson* factors was a manifest error." *Rodriguez v. Rodriguez*, 2 So. 3d 720, 729 (¶22) (Miss. Ct. App. 2009) (citing *Ory v. Ory*, 936 So. 2d 405, 413 (¶23) (Miss. Ct. App. 2006) (finding no error in chancellor's failure to consider adultery on the record when dividing marital estate when no evidence was presented that wife's conduct affected stability of marriage). The record does not establish that the affairs caused Melissa to abandon her marital duties or affected her contributions to the accumulation of the marital assets. As such, we do not find reversible error. This issue is without merit.

16

*IV.    Child-Support Award*

¶34.    Clint argues that in awarding him child support under Mississippi Code Annotated section 43-19-101 (Rev. 2015), the chancellor failed to consider all of Melissa's income, including alleged trust-fund distributions and other unidentified sources of regular income. In response, Melissa argues that the record does not support a finding that she receives trust-fund distributions or that she has additional, undisclosed sources of income.

¶35.    In her financial-disclosure statement, Melissa stated that her monthly income was $5,130, and the record fails to establish that her income was enhanced by regular distributions from her trust or that she had other sources of income. And Clint has failed to submit any evidence to support his bare allegations regarding Melissa's income. As such, we find that the chancellor did not abuse his discretion in failing to consider any distributions or undisclosed income for purposes of the child-support award. This issue is without merit.

¶36.    **THE JUDGMENT OF THE CHANCERY COURT OF RANKIN COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.**

**LEE, C.J., GRIFFIS, P.J., BARNES, ISHEE, FAIR, JAMES, WILSON AND GREENLEE, JJ., CONCUR. CARLTON, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.**