989 So.2d 466 (2008)
In the Matter of the ESTATE OF Grover S. SUMMERLIN, Deceased.
Barbara Ann Lynch, Appellant
v.
Curtis Summerlin, Appellee.
No. 2007-CA-00055-COA.
Court of Appeals of Mississippi.
August 19, 2008.
*468 James Mortimer Crews, Canton, attorney for appellant.
Durwood Earnest McGuffee, Madison, attorney for appellee.
Before MYERS, P.J., CHANDLER and BARNES, JJ.
BARNES, J., for the Court.
¶ 1. In August 2003, Grover S. Summerlin executed a quitclaim deed conveying a parcel of land situated in Madison County, Mississippi to his son, Curtis Summerlin, to the exclusion of his daughter, Barbara Ann Lynch. The legal description of the land attached to the quitclaim deed was different from the legal description contained in Grover's original warranty deed. Upon Grover's death, Lynch filed a petition to set aside the conveyance of the land on the grounds that the quitclaim deed was the product of undue influence; she later amended her petition to allege that the conveyance was void due to an inaccurate legal description. In response, Curtis filed a counterclaim seeking reformation of the quitclaim deed. The Chancery Court of Madison County denied Lynch's petition on the ground that there was no confidential relationship between Grover and Curtis and granted Curtis's petition to reform the quitclaim deed.
¶ 2. On appeal, Lynch argues that the chancery court erred in finding that there was no confidential relationship between Grover and Curtis; therefore, no presumption of undue influence arose regarding the execution of the quitclaim deed.[1] Lynch also argues that the chancery court erred in reforming the quitclaim deed based on the finding that the inconsistency between the legal description of the land in the quitclaim deed and the description in the warranty deed was the result of a scrivener's error. Finding no error, we affirm the judgment of the chancery court.

FACTS AND PROCEDURAL HISTORY
¶ 3. Upon Grover's death, Lynch filed a petition in the Madison County Chancery Court seeking to be appointed as administratrix of the estate. The chancellor granted the petition and ordered letters of *469 administration administered to Lynch upon her entering a bond. Following the issuance of letters of administration, Lynch filed a summary petition to discover assets, alleging that Curtis had concealed and wrongfully withheld certain assets of the estate and seeking an order compelling him to deliver all assets in his possession pending the conclusion of the administration of the estate.
¶ 4. Curtis subsequently filed a petition for probate of Grover's last will and testament and for the issuance of letters testamentary. He also filed a response to Lynch's summary petition to discover assets stating that he had not concealed assets of Grover's estate; rather, no real property of the estate existed as Grover had conveyed to him, via quitclaim deed, all of the land he owned and reserved himself a life estate in such land. In response, Lynch filed a petition to set aside the conveyance of the land on the grounds of lack of testamentary capacity to effect a valid conveyance, lack of consideration, and that the conveyance was the product of undue influence.
¶ 5. The chancery court entered a decree admitting Grover's last will and testament to probate and granting letters testamentary to Curtis as executor. Curtis filed an answer to the petition to set aside the conveyance denying each of the allegations therein. Lynch then filed an amended petition to set aside the conveyance of the real property, alleging that certain conveyances were void due to an inaccurate legal description. The petition alleged that the legal description of the real property purportedly conveyed by the quitclaim deed was the "W 1/2 of NE 1/4 and NW 1/4 of SE 1/4 and NE 1/4 of Section 4, and Lot 9 E.B.L. of Section 5" while the warranty deed reflected that Grover owned certain real property described as the "W 1/2 of NE 1/4 and NW 1/4 of SE 1/4 and NW 1/4 of Section 4, and Lot 9 E.B.L. of Section 5." Curtis filed an answer to the amended petition and a counterclaim seeking reformation of the quitclaim deed based upon a mistake or scrivener's error. Lynch filed an answer, arguing that the counterclaim seeking reformation of the quitclaim deed failed to state a claim upon which relief could be granted and that Curtis was entitled to no relief. A trial in this action was then held.
¶ 6. First to testify at trial was Curtis. He testified that he and his father had a "normal father-son relationship." He stated that Grover's physical health was declining during the last years of his life; although Grover was seeing a physician for Parkinson's disease, he was never officially diagnosed with that disease. Curtis testified that the symptoms of Parkinson's disease exhibited by Grover were a tremor in his left leg and both of his hands. He stated that the symptoms would "come and go" and typically occurred more in the mornings than during the day. According to Curtis, the disease did affect his father's mobility. Curtis stated that his father's primary health condition was congestive heart failure, which also affected his mobility and reduced his independence.
¶ 7. Curtis testified that, in the last few years of his life, Grover spent time in his room at his house and in the yard or on the patio. He stated that Grover had hearing loss. Curtis further stated, however, that although he sometimes had to repeat himself or speak in louder tone of voice than normal, Grover's hearing loss did not affect his ability to carry on a conversation. According to Curtis, Grover was very independent and would still try to drive occasionally during his last years, but he had trouble doing so in a safe manner. He stated that Grover stopped driving altogether two or three weeks prior to his death because he backed into a *470 pine tree. Curtis testified that he called Grover on the phone every week during the last few years of his life, and he drove him to the farm most weekends. He stated that Grover recognized him and was able to feed and dress himself during the last years of his life, and that Grover was never declared mentally incompetent by a physician.
¶ 8. Curtis testified that Grover required medical attention during his last years. According to Curtis, he took Grover to the doctor between twenty and thirty times during the last four to five years of his life, primarily for treatment for cataracts in both of his eyes. However, Lynch and Grover's wife, Alton Summerlin, also drove him to the doctor. Curtis drove his father to the doctor for his cataract surgery and drove him home, but he did not care for him following the surgery. He never assisted his father with his personal business or in managing his money, such as paying bills or writing checks; rather, Grover's wife, Alton, aided him in this regard. Curtis stated that it was his understanding that Alton primarily handled the day-to-day business affairs. Curtis and Grover never shared a joint bank account of any kind, nor did Curtis ever have Grover's power of attorney.
¶ 9. According to Curtis, Grover's land was "his life." Curtis stated that during the last years of his father's life, Curtis took an increasingly active role in helping his father maintain the land, performing tasks such as bush hogging, working on the tractor, and planting trees. Grover designated Curtis's son, Curt, as his attorney-in-fact in dealing with the Department of Agriculture in matters pertaining to the land. Curtis testified that he and Grover were on the farm one day in 2003 when Grover told him that he wanted to see an attorney. Curtis asked Grover if he knew an attorney, to which Grover responded that he knew one named "Christopher," but he did not know where the attorney's office was located. When Grover stated that he did not know any other attorneys, Curtis suggested Steve Ratcliff. Ratcliff had assisted Curtis in three to four real estate transactions in the past and had assisted Curtis's granddaughter in a real estate transaction.[2]
¶ 10. Curtis called Ratcliff's office, and Ratcliff told Curtis to come to the office. When Curtis and Grover arrived at the office, they went to the conference room with Ratcliff. The subject of a quitclaim deed by which Grover would convey the farm to Curtis was then discussed. According to Curtis, Grover stated that he wanted his son to have the farm. Curtis testified that he asked Grover if he was sure he wanted to do that, at which time Grover "sort of came up out of his chair and said `it is my blank farm and I'll do whatever the blank I want do with it.'" According to Curtis, Ratcliff then asked him to leave the room.
¶ 11. While Curtis sat in the waiting area outside of the conference room, Grover and Ratcliff met privately. Curtis did not know if Ratcliff prepared the quitclaim deed that day, but he stated that nothing was signed during the meeting; rather, he and Grover returned to Ratcliff's office in approximately August 2003 in order to execute the quitclaim deed. Curtis testified that Grover told Ratcliff how to list the names on the quitclaim deed. Attached to the quitclaim deed was a legal description of Grover's property. Curtis stated that he obtained the description from the courthouse by copying it by hand onto a piece of paper from the original and provided it to Ratcliff. Grover did not review the legal description prior to Curtis's giving it to *471 Ratcliff. Curtis acknowledged that the description attached to the quitclaim deed referred to the northeast corner of Section 4 rather than the northwest corner of Section 4, as indicated in the original description.
¶ 12. Curtis stated that he was not present at the time Grover signed the quitclaim deed; rather, he was in the hallway outside of the conference room. Curtis testified that the door to the conference room was partially open so he could see Grover's shoulder, but Grover could not see him. At the same time he executed the quitclaim deed, Grover also executed a will, and Curtis waited outside in the hallway while Grover signed it as well. Curtis testified that there were two or three women in the room with Grover and Ratcliff, one being Ratcliff's wife, Holly. When Curtis returned to the conference room, Ratcliff explained to him what Grover had done with regard to the land and the remainder of his assets.
¶ 13. The quitclaim deed conveyed the land to Curtis, but the deed reserved a life estate in the land for Grover. The will left everything except the land equally to Curtis, Lynch, and Alton.[3] Curtis paid Ratcliff $300 for his services, for which Grover later reimbursed him against Curtis's wishes. Curtis testified that prior to that day in Ratcliff's office, he and Grover had never discussed what Grover wanted to do with his land, but Curtis assumed that he would leave it to him and his sister equally; therefore, it was a surprise when Grover left all of the land to him. According to Curtis, Grover had a good relationship with Lynch. Curtis did not tell Lynch or Alton about the quitclaim deed or will prior to his Grover's death; he maintained "confidentiality." Curtis testified that Grover did not have a good relationship with Lynch's husband, Malcolm, but he did not know why. He further testified that he had conversations with Grover about altercations between Grover and Lynch.
¶ 14. Ratcliff was next to testify. He acknowledged that he had assisted Curtis with numerous real estate transactions and that there was an attorney/client relationship between himself and Curtis. Ratcliff testified that during the meeting with Curtis and Grover, Grover stated to him that he wanted to direct the vast majority of his estate to his son, Curtis, and he wanted to execute a quitclaim deed on some real property that he owned to Curtis also. He stated that during the meeting, although Curtis did make some statements, most of the statements that were made were made by Grover. According to Ratcliff, Grover was "mentally very coherent," and Ratcliff "felt like he knew what he was doing." Ratcliff stated that Grover "did not get around very good" and needed "some help getting up and down from the chair, from the couch and that type of thing." He further stated that Grover did not have any problems hearing him during the meeting.
¶ 15. Ratcliff testified that whenever an individual chooses to leave a larger gift or an entire gift to one child to the exclusion of another, he makes it a point to ensure that such is the individual's intention and that the individual is mentally capable of making that decision. According to Ratcliff, Grover's mind was "sharp, . . . sharper than [he] thought" for an elderly person. In Ratcliff's opinion, Grover "knew what he was doing" and knew the consequences of his actions. Ratcliff had no doubt that Grover's intention was to give his land to Curtis. He testified that Grover indicated that his reason for leaving his land to Curtis was their close relationship, which was closer than the relationship *472 he had with Lynch. Ratcliff stated that he remembered Curtis's asking Grover if he was certain of his decision to give him the land, but he did not remember Grover's response being argumentative or containing profanity. He did, however, remember that his response indicated that he was certain that he wanted to give his land to Curtis. According to Ratcliff, based on his experience with Grover and Curtis, Grover was the dominant party in the relationship and in his opinion Grover was not easily influenced. Ratcliff stated that Grover seemed "very strong-willed."
¶ 16. Ratcliff testified that both Curtis and Grover provided him with the names of the grantor and grantee on the quitclaim deed. He stated that the reservation of a life estate in the property for Grover may have been his idea and could have been for tax purposes, but he was not sure. According to Ratcliff, the legal description of the property in the quitclaim deed was provided by Curtis, possibly in the form of an old deed. He then stated that he was certain that they had a copy of an old deed.
¶ 17. Ratcliff stated that Grover was present along with two witnesses. He did not know whether Curtis was in the room when the documents were signed or if he was able to see Grover sign the documents, but he would "have to assume . . . [Curtis] knew what was going on" because he had heard the conversations between Ratcliff and Grover. According to Ratcliff, it was possible that the conference room door could have been open during the signing of the will and the quitclaim deed and that Curtis could have seen what was happening.
¶ 18. Ratcliff testified that since the quitclaim deed and will were executed, he had been in contact with Curtis. Curtis called him when Lynch's petition was filed, and Ratcliff told him that he did not believe he would be able to represent him because he might eventually be called as a witness in the action. Ratcliff stated that he subsequently had two or three similar conversations with Curtis. According to Ratcliff, all of the parties involved acted in good faith in executing the quitclaim deed and the will. With regard to the inconsistency between the legal description attached to the quitclaim deed and the original description in the warranty deed, Ratcliff testified that he strongly believed that the inconsistency was the result of an "error in his office" and that it was Grover's intention to convey all of the land that he owned by way of the quitclaim deed he executed.
¶ 19. Ratcliff's wife, Holly, an attorney, testified that she was a witness to Grover's execution of the quitclaim deed and the will. She did not know Grover prior to the time the quitclaim deed and the will were executed, and she was unaware of the dynamics of the family relationship among Curtis, Lynch, and Grover. Holly stated that she had no reason to believe that Curtis should have received more than Lynch, or vice versa, or that they should have shared the property equally. She testified that it was not her normal practice to sign such documents as a witness if the individual executing them did not understand his or her actions. Holly testified that she signed an affidavit attesting to her belief that Grover had testamentary capacity and was not unduly influenced in executing the quitclaim deed and the will.
¶ 20. Next to testify was Lynch, who stated that during the last few years of his life, Grover was confined to a chair in his room, was "mainly immobile" due to his Parkinson's disease, physically weak, and hard of hearing. Lynch testified that Grover had tremendous build-up of fluid in his legs, ankles, and feet. She stated that he could not function on a daily basis, and he *473 needed help to get up and down and to move around. According to Lynch, Grover did not get dressed each day during the last years of his life; rather, he stayed in his pajamas. As for her father's hearing loss, Lynch stated that Grover could not hear and did not understand what was said to him. She testified that he could not carry on a conversation unless someone was sitting next to him, looking him in the face, and shouting. Even then, maintained Lynch, Grover was still sometimes unable to hear the person speaking to him.
¶ 21. Lynch testified that her father was not able to drive himself; therefore, initially, she would pick him up to go see the doctor treating his Parkinson's disease. However, eventually she just met Alton and Grover at the doctor's office. She stated that Grover needed a wheelchair to get into the doctor's office and that he never left the wheelchair while he was there. When Alton had a stroke, Lynch stayed with Grover from morning until night while Alton was in the hospital. Lynch testified that Grover would soil himself, but she was unable to clean him; therefore, she had to get an individual to come three times a week to bathe Grover and take his blood pressure and vital signs. Lynch testified that she also attempted to help her father manage his money and day-to-day business while Alton was in the hospital, but he did not want her help. She stated that even when Alton came home from the hospital, she would visit and help them both. According to Lynch, prior to Alton's stroke, Alton handled all of the bill-paying duties and banking for Grover, and she continued to do so until Grover died. Lynch stated that she and Grover had a very close relationship. She would visit him, on average, every two to three weeks, sometimes more often if he was sick, and she called him two days a week.
¶ 22. According to Lynch, she became aware after Grover's death that Grover had executed the quitclaim deed conveying the land to Curtis. She stated that her husband had called Curtis numerous times in an attempt to procure Grover's will, but he kept saying that he was still working on it. Lynch was aware that Grover had a will, but she did not know the contents.[4] Lynch testified that when Curtis finally brought the will to her, he showed her the quitclaim deed. She asked Curtis why he would do something like that to her and told Curtis that he had taken advantage of Grover. According to Lynch, Grover "could not do anything on his own," so he "relied on other people [and] trusted other people." She testified that he was strong-willed earlier in his life, but in the end, he let others control him. Lynch further stated that Grover never read anything before he signed it, and he had no idea what he signed in Ratcliff's office. She testified that she and Grover had never discussed what his intentions were as to the land following his death, but he had said that he would divide everything he had between Lynch and Curtis.[5]
¶ 23. Lynch testified that Grover was a trusting person and could have been deceived, especially due to his age and his health problems. She stated that Curtis had "no relationship" with Grover, and that when Grover married Alton, Curtis stopped visiting Grover. According to *474 Lynch, Curtis did not start visiting Grover again until approximately four or five years before his death when his health started to decline. She testified that Curtis's visits were taxing on Grover because Curtis would ask for the keys to the tractor to work on the land; so Grover finally gave in and allowed Curtis to start working on the land.
¶ 24. Lynch stated that her father did not have the mental capacity to execute the will and the quitclaim deed. She acknowledged that in her deposition taken in 2003, she had stated that Grover knew who he was at that time, that he knew who she was, and that when he would speak to his grandchildren on the phone, he knew who they were and their names. She also stated that Grover was able to talk to her on the phone; however, it would be hard at times because she had to repeat herself. According to Lynch, Grover became unable to call her in the last two years of his life. She acknowledged that in the right circumstances, Grover was able to have normal day-to-day conversations in August 2003, and he could talk about the news and current events if he had seen something on television. Lynch acknowledged that she personally never saw Curtis exert any undue influence over Grover.
¶ 25. Lynch recalled an altercation that she had with Grover during the last year of his life. On Father's Day, Grover asked her to return some guns that he had given to her son so they could be used in an exhibit, but she refused because the guns belonged to and were in the possession of her son. Lynch stated that Grover did not raise his voice or yell at her for refusing to return the guns, and the two made up shortly thereafter. She testified that Grover called her two days later and apologized. According to Lynch, the reason Grover asked for the guns was because Curtis wanted them, not for an exhibit. Lynch's husband, Malcolm, testified that he and Grover had a great relationship and that the only conflict they had was during the gun incident. He stated that Grover became agitated when Lynch refused to return the guns, but he could not remember if he used any profanity. He stated that Grover was often difficult to converse with due to his hearing problem. According to Malcolm, he and Grover never discussed his plans for the land following his death, but he heard Grover tell Alton on more than one occasion that she had nothing to worry about. Malcolm testified that Grover could be stubborn and strong-willed and was not the type of man who could be told what to do. He stated that he was able to carry on conversations with Grover in 2003, although he would sometimes have to repeat himself, and that Grover knew who he was and was aware of current events.
¶ 26. Danny Lynch, Grover's grandson, testified that he and Grover had a very close relationship. He stated that Grover told Curtis and Lynch that they had nothing to worry about, and it was always "understood" that Grover's land would be divided equally between the two. According to Danny, nothing ever led him to believe that Grover and Lynch had anything other than a loving relationship. Danny testified that Grover was strong-willed and could be stubborn at times. However, he stated that Grover could be influenced to do something he did not want to do in his later years. Danny testified Grover was immobile in his later years and relied heavily on his family "to do everything for him," both physically and mentally. He stated that Lynch "basically did everything" for Grover when Alton had a stroke because Grover "couldn't transact or do anything." However, Danny testified that although Grover had hearing loss, he could comprehend something once he heard it.
*475 ¶ 27. Because Alton died prior to the trial in this matter, her deposition, which she read and signed before her death, was read into the record. Alton stated that after she and Grover married, she did not have many opportunities to be around Lynch and Curtis. She stated that Grover and Lynch had a good relationship and that Lynch called and visited Grover. However, according to Alton, the good relationship between Grover and Lynch did not last until Grover's death. Alton recounted the incident in which Grover asked Lynch to return the guns so he could show them to some children who wanted to see them. Alton stated that she did not know if Grover was angry with Lynch for not returning the guns, but there was an unpleasant confrontation.[6]
¶ 28. Alton stated that she was the one who typically took Grover to the doctor, but during the last year to year-and-a-half of Grover's life, Lynch would accompany Alton and Grover to the doctor to help. According to Alton, Grover did not see Curtis as much because Curtis was always at work or busy, but Curtis did take Grover to the eye doctor a few times toward the end of his life. She stated that Curtis did not call his dad on the telephone very often, but he did come by and visit more toward the end of Grover's life. Alton stated that Curtis and Grover had a loving father-son relationship because "the older his daddy got, the more [Curtis] saw him and did for him," and she never saw Curtis and Grover have any type of disagreement. She testified that Curtis never took Grover to run errands.
¶ 29. Alton stated that the effects of Grover's Parkinson's disease were all physical. With regard to Grover's mind, she stated that it might not have been as clear as it was earlier due to his age and the disease. However, she testified that in August 2003 Grover was mentally aware of what he was doing. According to Alton, Grover was not the type of person who could be manipulated, and he was very strong-willed, meaning that "if he told you something, he stuck by it, he did it." Alton testified that Grover had basically no hearing in one ear and sometimes had trouble understanding what someone was saying to him. She stated that she handled all of the couple's finances.
¶ 30. Alton testified that she and Grover never discussed drafting a will or transferring any land to family members prior to August 2003. She was not aware that Grover had executed the quitclaim deed transferring the land to Curtis until after it was done when she found the quitclaim deed on Grover's desk and read it, but she did not realize at that time that Curtis had been given all of the land.[7] Alton stated that Grover never indicated to her that he wanted his children to share the land equally, but it "was just assumed that [her] children would get [hers] and his children would get his." According to Alton, she never had any reason to believe that Grover wanted to exclude Lynch from receiving any of the land, and it was somewhat of a surprise that he did so.
¶ 31. Alton testified that Grover told her in 2003, but prior to August of that year, that he wanted Curtis to have 160 acres of land where the house was; so he got a quitclaim deed. She stated that she never saw Curtis ask his father for the land or put any pressure on him to give him the land since he had been helping to *476 maintain the land. Alton testified that Curtis did a lot of work on the land "around the time or before the quitclaim deed."[8] She stated that Grover did not want anyone to "have anything to do with his equipment or any change to his home, his place"; however, when asked whether it bothered Grover when Curtis would work on the land, Alton stated that Grover "loved it."
¶ 32. Alton opined that the reason Grover left all of the land to Curtis may have been the argument he and Lynch had regarding the guns. She stated that Grover told her that Lynch called his World War II memorabilia "a bunch of junk." According to Alton, following the argument, Grover said regarding Lynch's husband, Malcolm, "if I had had a gun, I would have shot him." Alton testified that Lynch contacted her after Grover passed away and told her that she needed to be on her side in this matter or she would not "have a chance" or "at least I want you to help me" or "I will need you. . . something to that effect."
¶ 33. Following the conclusion of Lynch's case, the chancellor stated to Curtis's attorney that he "expected [him] to make a motion," referring to a motion for a directed verdict. Curtis's attorney then moved for a directed verdict on the ground that Lynch failed to make out a prima facie case that a confidential relationship existed between Grover and Curtis. The chancery court granted the motion for a directed verdict and dismissed Lynch's petition. The chancery court also granted Curtis's counterclaim seeking reformation of the quitclaim deed, thereby reforming the deed to grant Curtis all of the land owned by Grover as described in the original warranty deed.
¶ 34. Lynch then initiated the instant appeal, arguing the following grounds for relief: (1) the chancery court erred in finding that there was no confidential relationship between Grover and Curtis and that no presumption of undue influence arose regarding the execution of the quitclaim deed, and (2) the chancery court erred in reforming the quitclaim deed based on the finding that the inconsistency between the legal description of the land in the quitclaim deed and the description in the warranty deed was the result of a scrivener's error. Finding no error, we affirm.

STANDARD OF REVIEW
¶ 35. We note initially that the motion made in this case was improperly denominated a motion for directed verdict. "[I]n a bench trial, the proper motion to make at the close of plaintiff's case-in-chief is a motion for involuntary dismissal under Rule 41(b) of the Mississippi Rules of Civil Procedure." Ladner v. Stone County, 938 So.2d 270, 273(¶ 9) (Miss.Ct.App.2006) (citing Partlow v. McDonald, 877 So.2d 414, 416(¶ 7) (Miss.Ct.App.2003)). "Rule 50(a) directed verdicts are reserved only for jury trials." Id. "This distinction must be understood, because the standard of review for a dismissal is different than that for a directed verdict." Id.
¶ 36. "In considering a motion for involuntary dismissal under Rule 41(b), the trial court should consider `the evidence fairly, as distinguished from in the light most favorable to the plaintiff,' and the judge should dismiss the case if it would find for the defendant." Id. at *477 (¶ 10) (quoting Century 21 Deep S. Props., Ltd. v. Corson, 612 So.2d 359, 369 (Miss. 1992)). "We must apply the substantial evidence/manifest error standard to an appeal of a grant or denial of a motion to dismiss pursuant to M.R.C.P. 41(b)." Id. "Where there arguably is evidence that a party might be entitled to a judgment, the court errs in dismissing the case." Id. (citing Aronson v. Univ. of Miss., 828 So.2d 752, 756(¶ 14) (Miss.2002)). "We defer to findings of fact and review legal conclusions de novo." Id. (citing Aronson, 828 So.2d at 755(¶ 12)).

DISCUSSION OF THE ISSUES

I. Whether the chancellor erred in finding that no confidential relationship existed between Grover and Curtis and that no presumption of undue influence arose with regard to the execution of the quitclaim deed.
¶ 37. Lynch argues that the chancellor erred in finding that there existed no confidential relationship between Grover and Curtis such that a presumption of undue influence arose with regard to the execution of the quitclaim deed. The quitclaim deed conveying the entirety of Grover's land to Curtis constituted an inter vivos gift, and "Mississippi law clearly recognizes that `an inter vivos gift is a perfectly lawful means of transferring real property in this state.'" In re Estate of Lane, 930 So.2d 421, 425(¶ 11) (Miss.Ct. App.2005) (quoting Anderson v. Burt, 507 So.2d 32, 36 (Miss.1987)). "Gifts of real property between family members are a normal occurrence, and our courts will not act when a conveyance from a parent to a child is a purely voluntary act." Id. "In fact, `[a] deed from a parent to a child alone and of itself raises no presumption of undue influence since, in the absence of evidence to the contrary, the parent is presumably the dominant party. This is true even though the parent is aged, or aged and infirm.'" Id. (quoting Thomas v. Jolly, 251 Miss. 448, 454-55, 170 So.2d 16, 19 (1964)).
¶ 38. However, when a confidential relationship is shown to have existed between the grantor and the grantee at the time of the conveyance, the conveyance will be scrutinized by the courts. Id. at (¶ 12). "A confidential relationship arises `whenever there is a relationship between two people in which one person is in a position to exercise dominant influence upon the other because of the latter's dependency on the former arising either from weakness of mind or body, or through trust[.]" In re Estate of Reid, 825 So.2d 1, 5(¶ 13) (Miss.2002) (quoting Hendricks v. James, 421 So.2d 1031, 1041 (Miss.1982) (overruled in part on other grounds)). "The burden of establishing the existence of a fiduciary relationship is upon the party asserting it." Mullins v. Ratcliff, 515 So.2d 1183, 1192 (Miss.1987). "Where a confidential relationship exists, there is a presumption of undue influence concerning an inter vivos gift." In re Estate of Reid, 825 So.2d at 5 (¶ 13).
¶ 39. In determining whether a confidential relationship exists between two individuals, the following factors are to be considered: (1) whether one person has to be taken care of by others, (2) whether one person maintains a close relationship with another, (3) whether one person is provided transportation and has their medical care provided for by another, (4) whether one person maintains joint accounts with another, (5) whether one is physically or mentally weak, (6) whether one is of advanced age or poor health, and (7) whether there exists a power of attorney between the one and another. Id. (citations omitted).
*478 ¶ 40. "Once a confidential relationship is found the burden shifts to the beneficiary to disprove the presumption of undue influence by clear and convincing evidence." Id. at (¶ 14) (citations omitted). "To overcome the presumption of undue influence, the proponents must show (a) good faith on the part of the beneficiary, (b) the grantor's full knowledge and deliberation of the consequences of her actions, and (c) the grantor's independent consent and action." Id. at 5-6(¶ 14) (citing Mullins, 515 So.2d at 1193).
¶ 41. In this case, the chancellor specifically considered each of the seven factors and concluded that there was no confidential relationship between Grover and Curtis. After careful consideration, we find substantial evidence supporting the chancellor's conclusion in this regard. As the chancellor found, the testimony of all witnesses established that Grover's physical health was not good and that he needed physical assistance; however, the testimony was also very clear that most of that help was provided by Alton, his wife, and then by Lynch, who would meet Alton and Grover at his doctor's appointments for his Parkinson's disease and who stayed with Grover while Alton was in the hospital following her stroke. Curtis did not assist Grover with his personal business or in managing his money, such as paying bills or writing checks; rather, it was Alton who handled all of the couple's finances. While the evidence revealed that Curtis did drive Grover to his eye doctor appointments and to a cataract surgery, and he worked on Grover's land, there was no evidence presented that Grover depended on Curtis for necessities. Accordingly, we find no error in the chancellor's conclusion that the majority of Grover's care was provided by Alton and Lynch.
¶ 42. As for whether Grover maintained a close relationship with Curtis, the chancellor found that the testimony established that Grover had a closer relationship with Alton and Lynch than he did with Curtis. Although Grover relied on Curtis to find an attorney to draft the quitclaim deed and to drive him to the attorney's office, the chancellor found that the testimony was clear that until the last few years, Curtis did not spend much time with his father. Curtis testified that he and his father had a "normal father-son relationship." This Court has noted that a normal father-son relationship coupled with a lack of evidence that the relationship was one in which the son "exerted a domineering influence over his father" did not support the existence of a confidential relationship. In re Estate of Lane, 930 So.2d at 426(¶ 15). We acknowledge that there was testimony from Ratcliff that it was his impression that Grover left the land to Curtis because of their close relationship. However, even assuming that the relationship between Grover and Curtis at the time of the execution of the quitclaim deed could have been described as "close," again, there was no evidence indicating that Curtis controlled Grover in any way as a result of that relationship. See Brown v. Ainsworth, 943 So.2d 757, 761(¶ 9) (Miss.Ct.App.2006) (finding that although the two individuals "enjoyed a close friendship," none of the evidence indicated that the grantee controlled the grantor).[9]
*479 ¶ 43. The chancellor found that Alton and Lynch provided most of the transportation to Grover's medical appointments, and this finding is clearly supported by substantial evidence. As noted above, the testimony revealed that while Curtis drove his father to his eye doctor appointments on more than one occasion and to his cataract surgery, it was Alton and Lynch who provided the majority of Grover's medical transportation. As for whether Grover was mentally or physically weak, the chancellor noted that Grover had numerous physical ailments and that he was physically weak. However, the chancellor found that there was no testimony establishing that Grover was mentally weak, "other than that normally ascribed to a ninety-year-old man." As the chancellor stated, Ratcliff testified that Grover was "mentally very coherent" during the meeting regarding the quitclaim deed and his mind was "sharper" than he would have expected for someone his age. Moreover, Alton testified that in August 2003 Grover's mental capabilities were such that he knew what he was doing. While Lynch and her son testified that Grover was easily influenced, Curtis and Alton both testified that Grove was strong-willed and not easily manipulated into doing something he did not want to do. See Miner v. Bertasi, 530 So.2d 168, 172 (Miss.1988) (finding the fact that the evidence indicated that the decedent was mentally sharp and strong-willed significant in overcoming the presumption of undue influence). Moreover, although it is clear that Grover had hearing problems, there was testimony indicating that he was able to carry on normal conversations and could comprehend what was said to him once he heard it. With regard to Grover's age and health, the chancellor acknowledged that Grover was of advanced age, had physical health problems, and was hearing-impaired. However, the chancellor found that the testimony established that Grover was an "exceptional senior" and was "mentally sharp." Finally, it is uncontested that Grover and Curtis held no joint accounts and that there existed no power of attorney between Grover and Curtis.[10]
¶ 44. The chancellor noted that he found the testimony of Ratcliff in this matter very compelling. He stated that he saw no evidence that Ratcliff exhibited any favoritism toward Curtis due to his prior attorney/client relationship with him. Ratcliff made it a point to ensure that Grover knew what he was doing in executing the quitclaim deed, and he was confident that Grover was certain of his decision to give Curtis all of the land. According to Ratcliff, Grover was mentally sharp and was the dominant figure in the execution of the quitclaim deed, not Curtis. The chancellor also noted Curtis's testimony regarding Grover's somewhat angry response to Curtis's question as to whether he was certain of his decision. In addition, he noted Alton's testimony that Grover "loved it" when Curtis worked on the land and the fact that the aforementioned confrontation *480 between Grover and Lynch occurred not long before the execution of the quitclaim deed.
¶ 45. Based on the foregoing facts, we conclude that the chancellor's finding that there was no confidential relationship between Grover and Curtis was supported by substantial evidence. Accordingly, we affirm the finding of the chancellor that no confidential relationship existed between Grover and Curtis and, therefore, that no presumption of undue influence arose.

II. Whether the chancery court erred in finding that the quitclaim deed was not void due to the inconsistency in the legal description of the land.
¶ 46. Lynch next contends that the chancery court erred in reforming the legal description in the quitclaim deed to coincide with the legal description contained in the original warranty deed in the land records. The quitclaim deed executed by Grover conveyed to Curtis property described as the "W 1/2 of NE 1/4 and NW 1/4 of SE 1/4 and NE 1/4 of Section 4, and Lot 9 E.B.L. of Section 5"; however, the warranty deed reflected that Grover owned property described as "the W 1/2 of NE 1/4 and NW 1/4 of SE 1/4 and NW 1/4 of Section 4, and Lot 9 E.B.L. of Section 5." The chancellor found that the evidence revealed that an error was made by Ratcliff's legal secretary in drafting the quitclaim deed and that the legal description in the quitclaim deed should have included all of the land owned by Grover. The chancellor stated that no evidence was presented to indicate that Grover did not intend to convey his entire farm in the quitclaim deed.
¶ 47. "In an action to reform a deed, the Mississippi Supreme Court has held that the party asserting reformation must prove (1) a mistake on the part of both parties; or (2) a mistake on the part of one party with fraud or inequitable conduct on the part of the other party; or (3) an error on the part of the scrivener." Bacot v. Duby, 724 So.2d 410, 417(¶ 35) (Miss.Ct.App.1998) (citing Perrien v. Mapp, 374 So.2d 794, 796 (Miss.1979) (overruled in part on other grounds); Veterans Admin. v. Bullock, 254 Miss. 562, 569-70, 180 So.2d 610, 614 (1965)). "Moreover, the mistake must be proven beyond a reasonable doubt." Id. (citing McCoy v. McCoy, 611 So.2d 957, 961 (Miss.1992)). "However, `[t]he mistake that will justify a reformation must be in the drafting of the instrument, not in the making of the contract.'" Townsend v. Townsend, 859 So.2d 370, 376(¶ 21) (Miss.2003) (citing Johnson v. Consolidated Am. Life Ins. Co., 244 So.2d 400, 402 (Miss.1971)).
¶ 48. Lynch relies on Curtis's testimony that he copied the legal description of the land from the original warranty deed; consequently, any mistake regarding the quitclaim deed was unilateral on the part of Curtis. Thus, Lynch contends that the chancellor erred in reforming the quitclaim deed. We disagree.
¶ 49. The Mississippi Supreme Court had held that "[a] scrivener's error may be sufficient to warrant the reformation of an instrument." Id. In Sunnybrook Children's Home, Inc. v. Dahlem, 265 So.2d 921, 925 (Miss.1972), the court held that the evidence showed that the grantor intended to convey property located in Range 7 East; therefore, the omission of the range number in the description of the property was a scrivener's error that warranted reformation of the quitclaim deed.
¶ 50. Here, as the chancellor noted, Ratcliff testified that he strongly believed that the inconsistency was the result of an "error in his office" and that it was Grover's intention to convey all of the land that he owned, described in the original warranty deed, by way of the quitclaim *481 deed the parties executed. Although Curtis testified that he copied the legal description by hand and gave it to Ratcliff, Ratcliff testified that the legal description was obtained from an old deed he had in his possession. Therefore, there is substantial evidence to support the chancellor's finding that the inconsistency in the legal description in the quitclaim deed was the result of a scrivener's error.
¶ 51. Moreover, we disagree with Lynch's contention that the mistake in the quitclaim deed was the result of a unilateral mistake on the part of Curtis. A mutual mistake "exists where there has been a meeting of the minds of the parties and an agreement actually entered into but the agreement in its written form does not express what was really intended by the parties." Black's Law Dictionary 1021 (6th ed.1990); see also Bert Allen Toyota, Inc. v. Grasz, 909 So.2d 763, 768(¶ 15) (Miss.Ct.App.2005) ("A mutual mistake is defined as `[a] mistake that is shared and relied on by both parties to a contract.'") (quoting Black's Law Dictionary 1023 (8th ed.2004)). Here, there was substantial evidence indicating that Grover intended to convey all of the land to Curtis; therefore, even assuming that Curtis made a mistake in transcribing the legal description of the land, Grover made a mistake as well in executing the quitclaim deed containing a description that did not reflect his intent. Therefore, both Grover and Curtis were acting under the assumption that all of Grover's land, which included the NW 1/4 of Section 4 rather than the NE 1/4 of Section 4, was being conveyed when in fact it was not. This constituted a mutual mistake.
¶ 52. Lynch argues that every witness in the trial other than Ratcliff testified that throughout Grover's life they assumed that he would leave his land equally to Lynch and Curtis. However, as the chancellor noted when discussing whether a confidential relationship existed between Grover and Curtis, it appeared from Alton's testimony that all conversations about Grover's land and assets were primarily in regard to a division between his assets and Alton's assets, and that Alton, Curtis, and Lynch all presumed that Grover was going to leave his land to Curtis and Lynch equally. Lynch also relies on Alton's testimony that Grover "wanted Curtis to have 160 acres where the house was. That's when he got a quitclaim deed." Since the amount of land ultimately conveyed to Curtis was 320 acres, Lynch contends that there was a substantial question as to the amount of land Grover intended to convey to Curtis. However, again, it is the sole responsibility of the chancellor to determine the weight and credibility of evidence. In this case, the chancellor obviously found Ratcliff's testimony regarding the inconsistency in the deed to be credible, and we are not permitted to question this finding on appeal.
¶ 53. Based on the foregoing, we find the chancellor's reformation of the quitclaim deed to be supported by substantial evidence; therefore, the chancellor's judgment is affirmed.
¶ 54. THE JUDGMENT OF THE CHANCERY COURT OF MADISON COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., LEE AND MYERS, P.JJ., IRVING, CHANDLER, GRIFFIS, ISHEE, ROBERTS AND CARLTON, JJ., CONCUR.
NOTES
[1] We note that Lynch divides this issue into three separate issues: (1) whether the trial court erred in finding that no confidential relationship existed; (2) whether the trial court erred in finding that the presumption of undue influence did not arise; and (3) whether the trial court erred in granting Curtis's motion for a directed verdict at the conclusion of Lynch's case-in-chief. Because these issues are interrelated, we have combined them into one issue.
[2] Curtis testified that he did not refer his granddaughter to Ratcliff.
[3] Grover also left Curtis his tractor, bush hog, and disc.
[4] Lynch stated that Grover and Alton had executed a will years ago, but she was unaware that they had redone it recently.
[5] She later acknowledged that she stated in her deposition that Grover told her four or five years previously that his personal property would be divided equally between herself and Curtis. She did not remember whether she stated in her deposition that Grover never mentioned the land during this conversation.
[6] Alton was not certain as to when the confrontation about the guns occurred, but she thought it was possibly within the last six or eight months of Grover's life.
[7] Alton stated that she and Grover never discussed the quitclaim deed, but Grover knew that she knew about it.
[8] When questioned as to why Grover asked her on more than one occasion why she did not like Curtis, Alton stated that Grover never let anyone touch his tractor, but he let Curtis have the key to it. She stated that she told Grover, "you're going to let Curtis, you know, maybe do things that you don't want him to do as far the place is concerned." According to Alton, that was why Grover got the impression that she did not like Curtis.
[9] Lynch argues that the "fairness of the outcome of [the] events" in this case, or the lack thereof, indicated that undue influence was the motivating factor for Grover's execution of the quitclaim deed. However, as the chancellor noted, there is no requirement that a parent be fair in how he or she allocates assets among his or her children so long as the parent's decision is of his or her own making, free of the overmastering influence of others.
[10] Lynch relies on the fact that Grover executed a United States Department of Agriculture Power of Attorney naming "Curtis Summerlin" as his attorney-in-fact. Curtis testified at trial that the power of attorney was intended to designate his son, Curtis Summerlin, Jr., as the attorney-in-fact. Lynch argues that Curtis's self-serving testimony was insufficient to establish that the power of attorney was intended to name Curtis's son as the attorney-in-fact rather than Curtis. However, the chancellor clearly found Curtis's testimony in this regard to be credible, as it is the job of the chancellor, not this Court, to judge the credibility of witnesses. See Davis v. Smith, 922 So.2d 814, 819(¶ 26) (Miss.Ct.App.2005) ("As the finder of fact, the chancellor also judges the weight and credibility to be accorded the evidence."). Accordingly, this argument is without merit.